HOFMANN v AUTO CLUB INSURANCE ASSOCIATION

Docket Nos. 150304, 151033, 151268. Submitted February 14, 1995, at Lansing. Decided May 19, 1995, at 10:05 A.M. Leave to appeal sought.

John Hofmann and Richard C. Herfert, each a licensed chiropractor, brought an action in the Wayne Circuit Court against the Auto Club Insurance Association, seeking both a declaration concerning what products and services are within the scope of the practice of chiropractic and an award of damages for unpaid billed charges submitted to the defendant for products and services supplied by the plaintiffs to persons injured in automobile accidents for which the defendant was liable for no-fault medical benefits. The defendant filed a countercomplaint seeking reimbursement of payments previously made to each of the plaintiffs for products and services that were outside the scope of the practice of chiropractic, for authorized products and services to the extent that the payments for those products and services exceeded the plaintiffs' customary charges for like products and services in cases not involving insurance, and for claims for which the plaintiffs already had received partial payment from Blue Cross and Blue Shield of Michigan. Following a bench trial, the court, Kaye Tertzag, J., found that the scope of the practice of chiropractic in Michigan included: orthopedic and neurological examinations; nutritional analysis and nutritional supplements; cervical supports, cervical pillows, and lumbar supports; cervical, spinal, and intersegmental traction; hot and cold packs; sot blocking and wedges; reevaluation x-rays; and pelvic x-rays. The court found that the scope of the practice of chiropractic in Michigan did not include: extended care as a separate unitary concept or the use of thermographic devices. The court awarded damages to the plaintiffs for permitted products and services supplied by them to the defendant's insureds for which the defendant had not made payment. With respect to the defendant's counterclaims, the court found that both plaintiffs had violated § 3157 of the no-fault act, MCL 500.3157; MSA 24.13157, by charging the defendant more for products and services than they customarily charged their patients in cases not involving insurance and that the plaintiffs improperly charged the defendant for amounts in excess of

what they already had received from Blue Cross. After determining the total overpayment and setting off the amounts owed by the defendant to the plaintiffs, the court entered awards for the defendant. The court entered an amended order of judgment that held that the defendant's counterclaims for reimbursement were subject to the one-year statute of limitation of the no-fault act, MCL 500.3145(1); MSA 24.13145(1), instead of the general six-year statute of limitation, MCL 600.5813; MSA 27A.5813, unless the Supreme Court reversed the holding of the Court of Appeals in *Auto Club Ins Ass'n v New York Life Ins Co*, 187 Mich App 276 (1991). The plaintiffs appealed, the defendant appealed, and the plaintiffs cross appealed. The appeals were consolidated.

The Court of Appeals *held:*

1. The trial court erred in concluding that the fact that a particular health-care activity was not authorized by the statute regulating the practice of chiropractic, MCL 333.16401 *et seq.*; MSA 14.15(16401) *et seq.*, precluded the expense of that activity from being an allowable expense pursuant to § 3107 of the no-fault act, MCL 500.3107; MSA 24.13107. Although an activity must be performed lawfully in order to be an allowable expense under § 3107, it does not follow that the rendering of an activity outside the scope of the practice of chiropractic is unlawful and, thus, not subject to payment as a no-fault benefit under § 3107. Accordingly, on remand, the trial court must determine whether each activity that is outside the scope of the practice of chiropractic and for which payment was sought is an activity that a chiropractor by law is prohibited from engaging in or whether it is otherwise unlawful. If the activity is not unlawful, payment under § 3107 must be ordered if the charge is reasonable and was incurred for reasonably necessary products or services for an injured person's care, recovery, or rehabilitation.

2. The trial court erred in determining that the use of any device or practice is prohibited pursuant to MCL 333.16423(2); MSA 14.15(16423)(2) unless the device or practice both meets nationally recognized standards and has been approved by the Michigan Board of Chiropractic. Section 16423(2) clearly only prohibits the use of analytical instruments and adjustment apparatus that either does not meet nationally recognized standards or has not been approved by the Board of Chiropractic. Because each of the devices at issue had been approved by the Board of Chiropractic, none of the devices is prohibited by § 16423(2), and it is unnecessary to assess independently whether those devices meet nationally recognized standards.

3. The use of pelvic x-rays is within the scope of the practice

of chiropractic when for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine within the meaning of MCL 333.16401(1)(b)(iii); MSA 14.15(16401)(1)(b)(iii).

4. Orthopedic and neurological examination of areas other than the spine is outside the scope of the practice of chiropractic.

5. The use of cervical pillows, cervical collars, lumbar belts, and lumbar supports is within the scope of the practice of chiropractic, because such devices are used to treat, rehabilitate, and maintain the spine to promote neural integrity within the meaning of MCL 333.16401(1)(b)(ii); MSA 14.15(16401)(1)(b)(ii).

6. The use of heat and cold packs is not within the scope of the practice of chiropractic.

7. The use of cervical and intersegmental traction is within the scope of the practice of chiropractic when used for the purpose of correcting subluxations or misalignments of the vertebral column or related bones and tissues, but is not within the scope of the practice of chiropractic when used for therapeutic treatment purposes. On remand, the trial court must determine for which purpose traction was used.

8. The use of SOT blocking is within the scope of the practice of chiropractic.

9. The use of those thermographic devices that are used to measure skin temperature at spots remote from the spine are not within the scope of the practice of chiropractic, while the use of those devices used to measure skin temperature in the area of the spine for the purpose of detecting subluxations is within the scope of the practice of chiropractic. The trial court's reservations concerning the efficacy of the use of thermographic devices in detecting subluxations, while not a proper consideration in determining whether the use of the devices is within the scope of the practice of chiropractic, are a proper consideration in determining whether the use of such devices is reasonably necessary for the injured person's care, recovery, or rehabilitation within the meaning of § 3107 of the no-fault act.

10. The defendant failed to plead properly the classical defenses such as the statute of limitations, the absence of a valid assignment by the insured, and prior payments or settlement and failed to litigate the merits of those defenses when afforded the opportunity to do so during trial. Accordingly, the defendant is deemed to have waived its classical contract defenses. That waiver, through the operation of res judicata, bars any future litigation of those defenses.

11. The trial court erred in holding that the plaintiffs did not

have the burden of establishing their right to payment under § 3107 of the no-fault act by establishing that the expense was reasonable and had been incurred for a reasonably necessary product or service and in finding that the defendant was liable for all charges for products and services that were within the scope of the practice of chiropractic without consideration whether the products and services were reasonable and necessary within the meaning of § 3107.

12. The trial court did not abuse its discretion in failing to add the Michigan Chiropractic Legal Action Fund as a party defendant.

13. The trial court properly allowed the admission into evidence pursuant to MRE 1006 of various exhibits offered by the defendant that summarized the billing and payment information contained in several hundred patient medical files and insurance claim files. Because the plaintiffs have not claimed that they were prejudiced by the defendant's failure to offer the underlying files for the plaintiffs' inspection until the middle of the trial, no error resulted from the failure to make those records available earlier.

14. The use of assumptions in a data summary offered as an exhibit pursuant to MRE 1006 is not impermissible per se; rather, where there is an evidentiary basis for an assumption, objections to the assumption go to the weight of the evidence, not its admissibility. Although some of the concerns expressed by the plaintiffs regarding the assumptions underlying the defendant's exhibits might be of some moment in a jury trial, those concerns are of less moment in a bench trial where it is assumed that the court will give such consideration to the exhibits as they deserve.

15. A review of each plaintiff's billing practices clearly supports the trial court's finding that each plaintiff charged higher fees for services other than x-ray services in cases in which there was no-fault insurance than were charged for the same services in cases in which there was no insurance. Such a billing procedure is clearly contrary to the intent of § 3157 of the no-fault act. Neither plaintiffs' designation of the charge in insurance cases as their customary charge nor the fact that the plaintiffs charged other insurers the same amount as the defendant changes the fact that the billing scheme undertaken by the plaintiffs violates the mandate of § 3157.

16. The trial court's determination that the average level of overcharging for services other than x-ray services was forty percent was within the range of proofs presented by the parties

and, considering all the evidence and circumstances, cannot be said to be clearly erroneous.

17. Because the only evidence offered by the defendant con-. cerning charges for x-ray services was billing and payment information of charges presented and paid by Blue Cross and Blue Shield of Michigan and because that data does not establish a lower customary charge but rather establishes acceptance by the plaintiffs of a contractually governed lower payment, the defendant failed to establish that there were overcharges within the meaning of § 3157 with respect to x-ray services. Accordingly, the trial court's award of damages for overcharges for x-ray services must be vacated.

18. Because the defendant's counterclaim for reimbursement was a common-law action to recover amounts erroneously paid rather than action under the provisions of the no-fault act, pursuant to the holding of the Supreme Court in *Auto Club Ins Ass'n v New York Life Ins Co*, 440 Mich 126 (1990), the counterclaim is subject to the six-year general statute of limitation rather than the one-year no-fault statute of limitation.

19. Any statutory interest awarded pursuant to MCL 600.6013; MSA 27A.6013 may be calculated from the date of the filing of the complaints despite the fact that some of the individual claims arose after the respective complaints were filed.

Affirmed in part, reversed in part, vacated in part, and remanded.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Patrick B. McCauley* and *Patrick Burkett*), for the plaintiffs and counter-defendants.

*Brandt, Hanlon, Becker, Lanctot, McCutcheon, Schoolmaster & Taylor* (by *David J. Lanctot*) and *Scarfone & Geen* (by *John B. Geen*) and (*Gross & Nemeth*, by *James G. Gross* and *Mary T. Nemeth*, of Counsel), for the defendant and counter-plaintiff.

Before: MICHAEL J. KELLY, P.J., and McDONALD and GRIFFIN, JJ.

PER CURIAM. In these consolidated appeals and cross appeal from a bench trial judgment and

order amending the judgment, we are asked to construe various provisions of Michigan's no-fault act, MCL 500.3101 *et seq.*; MSA 24.13101 *et seq.*, and the Public Health Code relative to the practice of chiropractic, MCL 333.16401 *et seq.*; MSA 14.15(16401) *et seq.*, in order to determine whether the expenses for various health-care products and services that were provided by plaintiffs to defendant's insureds during the course of chiropractic care are subject to payment as a no-fault benefit. We also are asked, inter alia, to evaluate the propriety of plaintiffs' charges for health-care services in cases involving no-fault insurance. We affirm in part, reverse in part, and remand for further proceedings.

I

BACKGROUND

Plaintiffs Hofmann and Herfert are licensed chiropractors who own separate chiropractic practices in Michigan. They both have patients who have no-fault automobile insurance coverage through defendant, Auto Club Insurance Association (ACIA). Sometime in 1984, ACIA made a "policy decision" that it would no longer pay for certain products and services that were being provided by chiropractors to its insureds, for the reason that the products and services were believed by ACIA to be outside the permissible scope of chiropractic practice in Michigan and, therefore, not subject to payment as a no-fault benefit.

On January 4, 1985, plaintiffs commenced this action in circuit court, seeking both a declaratory ruling that the subject products and services were within the scope of chiropractic, as well as an award of money damages based on ACIA's refusal to pay for those products and services that plain-

tiffs had provided to ACIA's insureds. On February 22, 1985, ACIA filed a countercomplaint seeking, inter alia, reimbursement for payments previously made to each plaintiff for (1) certain products and services that allegedly were outside the scope of chiropractic, (2) authorized products and services to the extent the payments for those products and services exceeded the plaintiffs' customary charges for like products and services in cases not involving insurance,[1] and (3) claims for which plaintiffs had already received partial payment from Blue Cross and Blue Shield of Michigan (BCBSM).[2]

The parties' various claims and counterclaims were litigated in a thirty-two-day bench trial that concluded in November 1989. On August 29, 1990, the trial court issued its written, eighty-six-page opinion, which contained rulings both favorable and unfavorable to each side. After entertaining post-trial motions, the trial court issued its final judgment on February 19, 1992, granting partial declaratory and monetary relief to each of the parties.

In particular, the trial court ruled that the following products and services are within the scope of chiropractic practice in Michigan: (a) orthopedic and neurological examinations; (b) nutritional analysis and nutritional supplements; (c) cervical supports, cervical pillows, and lumbar supports, the use of which constitutes "rehabilitative exercise"; (d) cervical, spinal, and intersegmental traction, the use of which constitutes "rehabilitative exercise"; (e) hot and cold packs; (f) SOT blocking and wedges; (g) re-evaluation x-rays; and (h) pelvic x-rays.

Plaintiffs Hofmann and Herfert were awarded

[1] See MCL 500.3157; MSA 24.13157.

[2] See *Dean v Auto Club Ins Ass'n*, 139 Mich App 266; 362 NW2d 247 (1984).

damages in the amount of $5,838.20 and $31,005.17, respectively, in compensation for their provision of the foregoing products and services to ACIA's insureds for which they did not receive payment from ACIA.

The trial court also ruled that the following services were outside the scope of chiropractic practice in Michigan:

(a) Extended care as a separate, unitary concept;

(b) The use of thermographic devices (including electronic infrared thermography, liquid crystal thermography, thermoscribe, dermathermograph, NCM and neurocalograph).

Additionally, the trial court found that both plaintiffs had violated MCL 500.3157; MSA 24.13157, by charging ACIA more for products and services in cases involving no-fault insurance than they customarily charged their patients in cases not involving insurance. The trial court further found that both plaintiffs had violated this Court's decision in *Dean v Auto Club Ins Ass'n*, 139 Mich App 266; 362 NW2d 247 (1984), by charging and receiving from ACIA amounts in excess of what plaintiffs had already received from BCBSM. The trial court determined that ACIA was entitled to total damages on its counterclaims, after setoff of the amounts owed by it to plaintiffs on the plaintiffs' principal claims, of $95,532.59 from plaintiff Hofmann and $7,563.49 from plaintiff Herfert.

Subsequently, on March 23, 1992, the trial court issued an order amending the February 19, 1992, judgment. The order provided that ACIA's right of recovery with regard to its various counterclaims for reimbursement would be limited to only those claims falling within the one-year period of limitation for the recovery of no-fault benefits embodied

in MCL 500.3145(1); MSA 24.13145(1), instead of the six-year period of limitation that had been applied in the calculation of damages under the original judgment. Instead of setting forth a revised damages award, however, the order merely stated that "amount(s) owing on the Judgment shall be recalculated at the conclusion of the appellate process."

Three separate appeals and a cross appeal have been filed by the parties from the trial court's judgment and order amending the judgment. The appeals have been consolidated for this Court's review.

## II

### THE CHIROPRACTIC STATUTE AND ITS RELATIONSHIP TO THE NO-FAULT STATUTE

The chiropractic statute, MCL 333.16401 *et seq.*; MSA 14.15(16401) *et seq.*, which is part of the Public Health Code, MCL 333.1101 *et seq.*; MSA 14.15(1101) *et seq.*, defines chiropractic and requires a person who practices it to be licensed. *Attorney General v Beno,* 422 Mich 293, 303-304; 373 NW2d 544 (1985). One of the tasks required of us in this case is to examine each of the healthcare products and services at issue[3] and determine whether it is within the statutory scope of chiropractic. However, because we are faced with these questions in the context of a dispute over entitlement to no-fault benefits, we will first analyze the effect, if any, of a given service or product's inclusion or exclusion from the scope of chiropractic on plaintiffs' entitlement to no-fault benefits for an expense relating to that service or product.

[3] The parties have appealed each of the trial court's "scope" rulings, with the exception of nutritional analysis and nutritional supplements, re-evaluation x-rays, and extended care.

The approach followed by the trial court was to examine each health-care activity in question to determine whether the activity was authorized by the chiropractic statute. To the extent authority for a given activity could be found therein, the trial court determined that the expense for that activity was payable as a no-fault benefit. Conversely, to the extent authority for a given health-care activity could not be found therein, the trial court determined that the expense for that activity was not payable as a no-fault benefit. While we agree that the expense for an activity included within the scope of chiropractic may be subject to payment as a no-fault benefit,[4] we disagree with the trial court's conclusion that no-fault benefits necessarily are not payable for any expense relating to an excluded activity. Although the trial court did not state directly the basis for this latter conclusion, we are led to believe by the parties' briefs that the trial court, and the parties, were operating under an assumption that an expense for an excluded health-care activity is not subject to payment as a no-fault benefit because the exercise of such an activity is unlawful.[5]

To be sure, only treatment lawfully rendered, including being in compliance with licensing requirements, is subject to payment as a no-fault benefit. *Cherry v State Farm Mutual Automobile Ins Co,* 195 Mich App 316, 320; 489 NW2d 788 (1992). It does not follow, however, that an activity is not lawfully rendered, and therefore not subject

[4] But see Part IV(B), *post* at 93-94.

[5] ACIA, in its brief on appeal, states: "*[A]s a matter of law,* all of the [disputed] items cannot be *lawfully* used by Michigan chiropractors . . . . Therefore, no-fault benefits are not recoverable for those items." Similarly, plaintiffs state in their brief on appeal: "Under the circuit court's ruling, chiropractors now act *illegally* when they use hand-held instruments and other thermographic devices which have been in wide use by members of their profession." [Emphasis added.]

to payment as a no-fault benefit, merely because it
is excluded from the statutory scope of chiroprac-
tic. In discussing the chiropractic statute, the Su-
preme Court in *Beno* explained:

> [T]he purpose of the licensing statute is not to
> prohibit the doing of those acts that are excluded
> from the definition of chiropractic, but to make it
> unlawful to do without a license those things that
> are within the definition.
>
> *     *     *
>
> The chiropractic statute does not prohibit the
> exercise of any non-chiropractic health-care activ-
> ity. It only defines chiropractic and requires a
> person who practices it to be licensed. [422 Mich
> 303-304.]

Thus, to the extent that plaintiffs are found to
have engaged in the exercise of a health-care
activity that is excluded from the statutory scope
of chiropractic, that mere fact of exclusion does
not, by itself, lead to the conclusion that the
activity was rendered unlawfully.

Because the lawfulness of a given activity, aside
from its exclusion from the chiropractic statute,
was not considered by the trial court below, to the
extent an activity is found to be excluded from the
scope of chiropractic we remand to the trial court
to afford the parties the opportunity to address
whether the exercise of that activity might be
considered unlawful as, for example, constituting
the practice of medicine without a license. *Id.* at
303. If the exercise of an excluded activity is found
to be unlawful, then any expense relating to that
activity is not subject to payment as a no-fault
benefit. *Cherry, supra.* If, however, it is deter-
mined that the exercise of an excluded activity is
not otherwise unlawful, then a further inquiry
must be conducted on remand to determine

whether the expense for that activity is payable as a no-fault benefit. In order to resolve this second inquiry, we must look to the no-fault statute.

Under MCL 500.3107; MSA 24.13107, no-fault personal injury protection benefits are payable only for "allowable expenses," which are defined as "consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." *Nasser v Auto Club Ins Ass'n,* 435 Mich 33, 49; 457 NW2d 637 (1990). To the extent plaintiffs provided a product or service that is excluded from the scope of chiropractic, they will have done so outside of their capacity as a licensed health-care provider. However, nothing in the language of § 3107 suggests that a product or service must be provided by a licensed health-care provider in order to constitute an allowable expense. To the contrary, the focus of § 3107 is on whether a given product or service is "reasonably necessary . . . for an injured person's care, recovery, or rehabilitation," not whether it was provided by a licensed health-care provider. Moreover, MCL 500.3157; MSA 24.13157 expressly indicates that no-fault benefits may be payable for charges by a "physician, hospital, clinic, *or other person.*" Decisions from this Court likewise indicate that a product or service provided by someone other than a licensed health-care provider may be subject to payment as a no-fault benefit. See *Reed v Citizens Ins Co of America,* 198 Mich App 443, 452; 499 NW2d 22 (1993) (the expense for accommodations provided by family members, as opposed to an institution, is an allowable no-fault expense); *Davis v Citizens Ins Co of America,* 195 Mich App 323, 327; 489 NW2d 214 (1992) (the cost of a modified van for use by a paraplegic is an allowable no-fault expense).

Accordingly, to the extent that plaintiffs are found to have engaged lawfully in the exercise of an activity that is excluded from the scope of chiropractic, then the expense for that activity will be payable as a no-fault benefit if it constitutes an allowable expense under § 3107 of the no-fault act. As noted previously, because these issues (lawfulness and qualification as an allowable no-fault expense) were not considered separately below, with regard to any activity that is found to be excluded from the scope of chiropractic, we remand this case to the trial court so that these issues may be addressed by the parties and decided by the trial court.

### III

#### THE SCOPE OF CHIROPRACTIC

Because the scope of chiropractic is statutorily defined, the question whether a given activity (hereinafter scope item) is within the authorized scope of chiropractic is primarily one of statutory construction to be decided by the court. *Beno, supra; Cotter v Blue Cross & Blue Shield of Michigan,* 94 Mich App 129, 135; 288 NW2d 594 (1979).

The practice of chiropractic is defined by MCL 333.16401(1)(b); MSA 14.15(16401)(1)(b), which states:

"Practice of chiropractic" means that discipline within the healing arts which deals with the nervous system and its relationship to the spinal column and its interrelationship with other body systems. Practice of chiropractic includes:

(i) Diagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care.

(ii) The adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity utilizing the inherent recuperative powers of the body for restoration and maintenance of health.

(iii) The use of analytical instruments, nutritional advice, rehabilitative exercise and adjustment apparatus regulated by rules promulgated by the board pursuant to section 16423, and the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine. The practice of chiropractic does not include the performance of incisive surgical procedures, the performance of an invasive procedure requiring instrumentation, or the dispensing or prescribing of drugs or medicine.

Another statutory provision that has an effect on the authority of a licensed chiropractor is MCL 333.16423(2), MSA 14.15(16423)(2), which provides:

An individual shall not use analytical instruments or adjustment apparatus which does not meet nationally recognized standards or which is not approved by the board.

Regarding the applicability of § 16423(2), the trial court stated, "[i]f a device *or practice* is found to be within the scope of chiropractic, the mandates of section 16423(2) must be satisfied." Moreover, although each of the disputed scope items in this case has been approved by the Board of Chiropractic, the trial court further construed § 16423(2) as requiring "that *both* preconditions be satisfied" (i.e., a device must meet nationally recognized standards *and* must also be approved by the Board of Chiropractic before it may be used). In line with this reasoning, the trial court proceeded to evaluate each disputed scope item in the case, including

those that do not involve the use of an analytical instrument or adjustment apparatus, to determine whether the item also met nationally recognized standards. We conclude that the trial court's construction of § 16423(2) is overly broad.

A fundamental principle of statutory construction is that the express mention in a statute of one thing implies the exclusion of others. *Jennings v Southwood,* 446 Mich 125, 142; 521 NW2d 230 (1994). Because § 16423(2) expressly refers only to analytical instruments and adjustment apparatus, the trial court erred in interpreting the statute as applying to other practices or procedures that do not involve the use of analytical instruments or adjustment apparatus.

We also agree with plaintiffs that the trial court erred in interpreting § 16423(2) as requiring "that both preconditions be satisfied." Properly construed, we conclude that § 16423(2) does not prohibit the use of an analytical instrument or adjustment apparatus if the instrument *either* (1) meets nationally recognized standards, *or* (2) has been approved by the Board of Chiropractic. We reach this conclusion for two reasons.

First, we observe that the statute employs the term "or," which is generally construed as referring to an alternative or choice between two or more things. *Beauregard-Bezou v Pierce,* 194 Mich App 388, 393-394; 487 NW2d 792 (1992).

Second, we note that § 16423(1) addresses the authority of the Board of Chiropractic to approve types and makes of instruments in the first instance and limits that authority to those instruments that meet established criteria that are "substantially equivalent to nationally recognized standards." If subsection 2 were construed as requiring that "both preconditions be satisfied," then that would reduce the nationally recognized standards

requirement in subsection 2 to surplusage, inasmuch as subsection 1 already imposes a requirement that an instrument must meet established criteria that are substantially equivalent to nationally recognized standards as a condition of board approval.[6] Courts will avoid a construction that would render a statute, or any part of it, surplusage. *NBD Bank, NA v Timberjack, Inc,* 208 Mich App 153, 158; 527 NW2d 50 (1994).

Accordingly, if an analytical instrument or adjustment apparatus meets nationally recognized standards *or* has been approved by the board, its use is not prohibited by § 16423(2). In this case, each of the instruments in question has been approved by the board. Therefore, none of the instruments are prohibited by § 16423(2), and it is unnecessary to assess independently the nationally recognized standards prong of § 16423(2). Nevertheless, the mere fact that an instrument has been approved by the board, and thus is not prohibited by § 16423(2), is not determinative of whether the instrument falls within the permissible scope of chiropractic in the first instance.[7] In order to resolve the initial "scope" question, we must look to the definition of "practice of chiropractic" delineated in MCL 333.16401(1)(b); MSA 14.15(16401)(1) (b) and determine whether the use of a given instrument is allowed under that definition.

[6] The trial court stated that it was adopting the construction that it did because, otherwise, the board could approve an instrument "regardless of its scientific validity or efficacy" and the Legislature "could not have intended that the board have such unbridled discretion." This concern is unwarranted, however, given that § 16423(1) does in fact restrict the board's authority by requiring that approval be limited to those instruments that meet established criteria that are substantially equivalent to nationally recognized standards.

[7] See *Cotter, supra,* 94 Mich App 135; *Attorney General v Recorder's Court Judge,* 92 Mich App 42, 57; 285 NW2d 53 (1979) (observing that the Board of Chiropractic is not authorized to expand the definition of the "practice of chiropractic").

It is against this backdrop that we will now examine each individual scope item at issue.

### A

#### PELVIC X-RAYS

A chiropractor's authority to take x-rays is delineated in § 16401(1)(b)(iii), which provides:

> [The practice of chiropractic includes] the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine.

ACIA argues that unless the pelvis properly can be classified as part of the spine, which ACIA maintains it cannot, pelvic x-rays are excluded from the scope of chiropractic. We disagree with this approach. The relevant inquiry, as we see it, is not whether the pelvis as a whole comprises part of the spine, but rather, as the statute indicates, whether a pelvic x-ray serves the purpose of "locating spinal subluxations or misaligned vertebrae of the human spine."

The Attorneys' Dictionary of Medicine, which is cited by ACIA, defines the pelvis and spine respectively as follows:

> *Pelvis.* An irregularly formed ring or girdle of bones[.] . . . It is composed of two roughly semicircular hip bones (innominate bones *and the lower, wedgeshaped end of the spine (sacrum and coccyx).* The two hip bones unite in front, but in the back they leave a gap which is filled in by the *part of the lower spine called the sacrum.* The coccyx is continued below the sacrum but does not touch the hip bone. The pelvis or the pelvis girdle is, therefore, actually composed of the two innominate bones *and the sacrum.* The coccyx is merely an

extension. Each innominate bone (os coxae) is composed of three parts, ilium, ischium, and pubis. The spine sits on top of the sacrum. [3 Schmidt, The Attorneys' Dictionary of Medicine, p P-95. Emphasis added.]

*Spine.* 1. The flexible bony column, in the back of the body, composed of 33 irregularly shaped, ring-like bones placed one on top of the other and held together by ligaments and muscles. Each individual bone is called *vertebra,* and the lower nine of these are fused together to form two larger bones, *the sacrum and the coccyx.* [4 Schmidt, *supra,* p S-174. Emphasis added.]

These definitions disclose that, while the pelvis as a whole is not part of the spine, both the sacrum and the coccyx, which comprise part of the pelvis, also comprise part of the spine. Here, each of the plaintiffs testified, and the trial court found, that the purpose of a pelvic x-ray is to determine the existence of a sacral subluxation. Because the sacrum is considered part of the spine, a sacral subluxation would constitute a spinal subluxation within the meaning of the statute. We conclude, therefore, that a pelvic x-ray taken "for the purpose of locating [a sacral] subluxation" is authorized by § 16401(1)(b)(iii).

We reject ACIA's argument that a pelvic x-ray is not permitted because a full spinal x-ray is able to depict the portion of the pelvis that articulates with the sacrum. This argument is relevant only to methodology, not the scope of chiropractic.[8] Likewise, the fact that a pelvic x-ray might reveal a condition that is not amenable to chiropractic treatment does not remove it from the purview of § 16401(1)(b)(iii).

[8] On the other hand, whether a pelvic x-ray is reasonably necessary in a given case would be relevant in determining whether the expense for that x-ray is an "allowable expense" under § 3107 of the no-fault statute.

B

ORTHOPEDIC AND NEUROLOGICAL EXAMINATIONS

Both plaintiffs testified that they conduct various orthopedic and neurological examinations of nonspinal areas in order to determine the effects of nerve interference caused by a subluxation on other parts of the body. These examinations include range of motion testing, reflex testing, various palpatory examinations, and neurological testing using devices such as a pinwheel.

Section 16401(1)(b)(i), which is cited by plaintiffs as the statutory basis for their authority to conduct orthopedic and neurological examinations, provides:

> [The practice of chiropractic includes] [d]iagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care.

In *Beno,* the Supreme Court held that the diagnosis and treatment of an elbow are both excluded from the scope of chiropractic. The Court explained its decision as follows:

> [T]he existence of subluxations or misalignments of the spine can only be observed where they exist. . . . Only by the process of elimination of other possible maladies (differential diagnosis) can the chiropractor then advise the patient that the pain in the elbow was caused by the spinal difficulty, which itself can only be directly observed in the spinal area.
>
> It could be helpful for the patient to know the consequences of his subluxation or misalignment, and it may influence the desirability of chiropractic treatment. Presumably, it would also help the

chiropractor explain why spinal treatment will not in given situations cure painful symptoms. Nevertheless, to allow this kind of diagnosis would require the chiropractor to recognize other maladies that are possible in many other parts of the anatomy and, in such case, lead the patient to believe that a definitive diagnosis relating to those other maladies that may be causing symptoms has been received. We do not believe the Legislature intended to authorize such diagnostic techniques. [422 Mich 312-313.]

The Supreme Court in *Beno* reached a similar conclusion with regard to general physical examinations, stating:

[S]pinal subluxations and misalignments can only be located at their source and . . . the effects of nerve interference on other parts of the body can only be ascertained by the elimination of other causes of the symptoms. We do not see anything in the words of the chiropractic licensing statute "diagnosis . . . to determine the existence of spinal subluxations or misalignments that produce nerve interference" that would suggest it could be read as "diagnosis to determine alternate causes of nerve interference" by the use of physical examination[.] . . . The plain words of § 16401 do not evince any legislative intent to license chiropractors to do physical examinations. [*Id.* at 325-326.]

In deciding these two matters, the Supreme Court also examined the legislative history of the Public Health Code, noting, (1) the Legislature rejected earlier drafts that would have included differential diagnosis as part of the practice of chiropractic, and (2) the Legislature rejected a proposed amendment that specifically would have authorized chiropractors to conduct physical exam-

inations. From this history, the Supreme Court concluded:

> The rejection of this "differential diagnosis" language by the Legislature convinces us that the drafters did not intend that chiropractors be authorized to diagnose or rule out the existence of localized non-spinal ailments . . . .
>
> * * *
>
> The rejection of the words "physical examination" in the proposed amendment bolsters the conclusion that the Legislature did not intend the performing of physical examinations to be within the scope of chiropractic. [*Id.* at 315, 326-327.]

We agree with ACIA that the foregoing rationale leads to the conclusion that orthopedic and neurological examination of nonspinal areas is excluded from the scope of chiropractic.

The orthopedic and neurological examinations in question are all types of physical examinations of nonspinal areas, the purpose of which, by the plaintiffs' own testimony, is to ascertain the effects of nerve interference allegedly caused by a subluxation on other parts of the body. As the Supreme Court observed in *Beno,* however, the effects of nerve interference on other parts of the body can be ascertained only by the elimination of other causes of the symptoms, which entails differential diagnosis, a procedure that is in contravention of both the intent and history of § 16401. For this reason, the Supreme Court concluded that a chiropractic "diagnosis" is limited to the determination of existing spinal subluxations or misalignments, which can only be located at their source, i.e., the spine. We conclude, therefore, that orthopedic and neurological examination of nonspinal areas is outside the scope of chiropractic practice.

C

### CERVICAL PILLOWS, CERVICAL COLLARS, LUMBAR BELTS AND LUMBAR SUPPORTS

According to the record, cervical collars are used to support and immobilize the cervical spine at the outset of an acute injury and may also be used to maintain the correction of a subluxation. A cervical pillow rehabilitates the ligaments and musculature of the cervical spine. A lumbar belt relieves strain on the lumbar muscles and spine, and a lumbar support helps restore the normal curvature of the lumbar spine.

Pursuant to § 16401(1)(b)(iii), the practice of chiropractic includes the use of "rehabilitative exercise . . . regulated by rules promulgated by the board." The board has issued the following rule regarding "rehabilitative exercise":

"Rehabilitative exercise" means the coordination of a patient's exercise program, the performance of tests and measurements, instruction and consultation, supervision of personnel, and the use of exercise and rehabilitative procedures, with or without assistive devices, for the purpose of correcting or preventing a subluxated or misaligned vertebrae of the vertebral column. [1982 AACS, R 338.12001(d).]

The trial court ruled that the supportive devices in question are authorized as rehabilitative exercise, reasoning:

[R]ehabilitative exercise, by definition, includes *passive* "rehabilitative procedures, with or without assistive devices." Cervical collars, cervical pillows, [and] lumbar supports . . . are assistive devices used in passive rehabilitative procedures complementing the inherent recuperative powers of the body. [Emphasis added.]

We disagree with the trial court's conclusion.

In *Beno, supra,* 422 Mich 333-334, the Supreme Court addressed whether an ultrasound machine, a diathermy machine, or a galvanic stimulator is authorized by the rehabilitative exercise aspect of the practice of chiropractic. After noting that the machines used sound waves, radio waves, and electric current, respectively, in order to compliment and help stabilize a manipulation, the Court rejected the notion that these uses constituted rehabilitative exercise, stating:

> This is not exercise within the meaning of § 16401. We cannot stretch the words "rehabilitative exercise" to include a situation where the patient *passively* receives treatment. [*Id.* at 333. Emphasis added.]

Although the board definition defines "rehabilitative exercise" as including "rehabilitative procedures, with or without assistive devices," the Supreme Court in *Beno* made clear that the board's definition may not be construed more broadly than the scope of the actual statutory language:

> [T]he board cannot, by regulation, turn a treatment procedure into an exercise program merely by labeling it so. Whatever definitions or regulations the board makes must fit within the plain meaning of the terms of the authorizing statute. [*Id.* at 333-334.]

Accordingly, because the statutory term "rehabilitative exercise" does not include passive treatment procedures, it would be improper to construe "rehabilitative procedures, with or without assistive

devices" as authorizing those devices that are used for passive treatment purposes.[9]

Each of the supportive devices in question here is used primarily for passive treatment purposes; they do not entail exercise. Whereas exercise entails active movement, the devices here are all used to restrict movement. They are used not to enhance exercise, but to inhibit it. Under *Beno,* these devices would not be authorized under the rehabilitative exercise aspect of the practice of chiropractic.

Nevertheless, we find that the supportive devices are authorized pursuant to the treatment aspect of the practice of chiropractic. Under § 16401(1)(b)(ii), the practice of chiropractic includes

[t]he adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity utilizing the inherent recuperative powers of the body for restoration and maintenance of health.

The purpose of the supportive devices is to treat and rehabilitate the spine in order to promote neural integrity. While some of these devices accomplish this purpose by rehabilitating the spinal ligaments and musculature, or by relieving strain on spinal muscles, the treatment authority prescribed by § 16401(1)(b)(ii) expressly extends to "related bones and *tissues.*" Furthermore, while the devices help stabilize the affected areas, the healing process itself is dependent upon the inherent recuperative powers of the body for restoration and maintenance of health.

Moreover, we believe that implicit in the author-

[9] According to one of ACIA's experts, Dr. J. Alan Robertson, examples of assistive devices used in rehabilitative exercise are a shoulder wheel or a finger ladder.

ity to treat "spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity" is the authority to promote the maintenance of the neural integrity of the spine through the use of supportive devices that, like the ones here, rely on the inherent recuperative powers of the body for restoration and maintenance of health. The fact that the statute refers to both "restoration and *maintenance* of health" bolsters this conclusion.

Accordingly, we find that the supportive devices in question are within the scope of the practice of chiropractic, albeit for reasons different than the trial court.

### D

### HEAT AND COLD PACKS

Our analysis of this issue is complicated by the fact that the trial court, in ruling that the use of heat and cold is within the scope of chiropractic, failed to identify the statutory basis relied upon for this conclusion. Moreover, plaintiffs merely adopt the trial court's ruling without offering any additional analysis.

At trial, plaintiff Hofmann suggested that the administration of heat and cold is authorized as rehabilitative exercise. However, consistent with our discussion of the supportive devices, we must reject this suggestion, given that the administration of heat and cold is done for therapeutic purposes and does not involve exercise. There is no suggestion in the record that the administration of heat and cold is related to any of the other aspects of the practice of chiropractic discussed in § 16401(1)(b)(iii) (i.e., analytical instruments, nutritional advice, adjustment apparatus, and x-rays), nor does the record suggest that heat and cold are

used for diagnostic purposes, § 16401(1)(b)(i). This leaves only the treatment aspect of the practice of chiropractic delineated in § 16401(1)(b)(ii), and our examination of that statutory language likewise fails to convince us that the administration of heat and cold was intended.

Our review of related statutes, and the legislative history of the chiropractic statute, further convinces us that the Legislature did not intend for heat and cold to be included within the practice of chiropractic.

Before the adoption of the present Public Health Code, the practice of chiropractic was defined as follows:

> [C]hiropractic is defined as "the locating of misaligned or displaced vertebrae of the human spine, *the procedure preparatory to* and the adjustment by hand of such misaligned or displaced vertebrae and surrounding bones or tissues, for the restoration and maintenance of health. . . . [MCL 338.156; MSA 14.596. Emphasis added.]

Heat and cold was approved under the former statute as a "procedure preparatory" to adjustment, a category that was excluded from the current act.

Additionally, since 1983, several bills have been offered in the Legislature, proposing to amend the statutory definition of practice of chiropractic to expressly allow for the use of heat or cold as ancillary physical measures to prepare the patient for chiropractic manipulation or adjustment. Those bills were all rejected.[10]

We also observe that both heat and cold expressly are authorized by the statute defining the

[10] See HB 4366 (April 13, 1983); HB 4279 (February 28, 1985); HB 4463 (April 9, 1987); SB 305 (May 7, 1991); SB 493 (March 11, 1993).

practice of physical therapy. MCL 333.17801(1)(b); MSA 14.15(17801)(1)(b). We acknowledge that merely because heat and cold are authorized by the physical therapy statute does not mean that they are excluded from the practice of chiropractic. See *Beno, supra,* 422 Mich 332. Nevertheless, when the absence of similar express authorization in the chiropractic statute is viewed in conjunction with the Legislature's failure to retain the "procedure preparatory" language of the former act pursuant to which the use of heat and cold formerly was deemed to have been authorized, together with the Legislature's repeated rejection of amendments that would allow expressly for the use of heat and cold, and, most importantly, the absence of any clear language in the present statute contemplating the use of heat or cold, we are compelled to conclude that heat and cold are not included within the scope of chiropractic practice.

E

### CERVICAL AND INTERSEGMENTAL TRACTION

According to the record, intersegmental traction involves the application of a force that causes the separation of the segments of the spinal column. The procedure typically is performed using a mobilization table that has large balls or rollers that roll up and down the spine, causing it to flex and extend. Cervical traction involves the application of a force that causes the cervical spine to extend or stretch. The record indicates that traction has been used by chiropractors for different purposes, sometimes to correct a subluxation and sometimes as a therapeutic massaging device. Plaintiff Hofmann admittedly has used traction for both purposes.

The trial court ruled that traction is an "assis-

tive device[] used in passive rehabilitative procedures" and, therefore, is authorized by the rehabilitative exercise aspect of the practice of chiropractic. Once again, we must reject this conclusion in light of our Supreme Court's holding in *Beno* that rehabilitative exercise does not include passive treatment procedures, which would include traction when used as a massaging device for therapeutic purposes.

Nonetheless, we believe that traction is permitted when used as an adjustment procedure in the correction of a subluxation. The practice of chiropractic includes the "adjustment of spinal subluxations and related bones and tissues," § 16401(1)(b)(ii), as well as the use of "adjustment apparatus regulated by rules promulgated by the board," § 16401(1)(b)(iii). The board has issued the following rule regarding "adjustment apparatus":

> "Adjustment apparatus" means a tool or device used to apply a mechanical force to correct a subluxation or misalignment of the vertebral column or related bones and tissues for the establishment of neural integrity. [1982 AACS, R 338.12001(a).]

Traction involves the application of a mechanical force to the vertebral column. Therefore, when used in this manner for the purpose of correcting a subluxation or misalignment, it fits the board definition of adjustment apparatus.

Accordingly, we conclude that traction is within the scope of chiropractic when used for purposes of correcting a subluxation or misalignment of the vertebral column or related bones and tissues, but excluded when used for therapeutic, treatment purposes. The trial court did not determine for which purpose traction was used in each specific

case at issue. Therefore, we remand for this determination.

F

### SOT BLOCKING AND WEDGES

SOT blocking is an adjustment procedure used to correct the alignment of the pelvis. The procedure is accomplished by having the patient lie on a board or firm surface and then having wedges strategically placed underneath the patient's lower back and pelvis in order to utilize the patient's body weight to cause "a torquing or a traction of the pelvis in order to bring it back into a more normal realignment." The trial court ruled, and we agree, that this procedure is within the scope of chiropractic.

We reject ACIA's argument that SOT blocking is not permitted because the pelvis is not part of the spine. Pursuant to § 16401(1)(b)(ii), a chiropractor is authorized to adjust "spinal subluxations or misalignments and *related bones* and tissues." As noted in our previous discussion of pelvic x-rays, the pelvis is comprised of the sacrum and coccyx, which are also parts of the spine, as well as two innominate bones that articulate with the sacral portion of the spine. SOT blocking is an adjustment procedure, and its purpose is to correct the alignment of the pelvic girdle as it relates to a sacroiliac, and possibly a lumbar, subluxation. In this context, the bones comprising the pelvis, to the extent they properly cannot be considered part of the spine, are "related bones" within the meaning of § 16401(1)(b)(ii).

We are not persuaded by ACIA's argument that SOT blocking is not permitted because it is not a "true chiropractic" adjustment. The statute does not define a "chiropractic" adjustment. It merely

requires that an adjustment be "of" spinal subluxations, misalignments, or related bones and tissues. As noted above, SOT blocking involves such an adjustment.

We also disagree with ACIA's contention that SOT blocking is not permitted because it does not involve the application of a mechanical force and, therefore, does not fit the board definition of "adjustment apparatus." As noted, the procedure is accomplished by strategically placing wedges underneath a patient's lower back or pelvis and then utilizing the patient's body weight to cause a torquing or traction of the pelvis in order to bring it back into a more normal realignment. Such a procedure involves the application of a mechanical force to accomplish the adjustment.

Accordingly, SOT blocking is within the scope of the practice of chiropractic.

G

THERMOGRAPHIC DEVICES

Thermographic devices are instruments that monitor the body's physiology by measuring heat along the surface of the skin. According to the record, dermathermography refers to the use of various hand-held instruments[11] that glide along the skin surface of a person's spinal area, producing either a graph or readout of the temperature at each spinal level. Thermography is an expansion of dermathermography and is used to depict images of heat differentials over entire regions of the body, including the arms, legs, and head. There are two types of thermography, liquid crys-

[11] The record described several different types and brand names, such as the dermathermograph (DTG), the Thermoscribe, the Neurocalometer (NCM), and the Neurocalograph.

tal and electronic infrared.[12] The theory behind dermathermography and thermography, as described in the record, is that a disruption or change in the heat pattern of a person's skin surface is indicative of possible neurological involvement caused by a subluxation. As both plaintiffs concede, however, there can be other causes for changes in skin temperature besides a subluxation.[13]

The alleged statutory bases for the use of thermographic devices are § 16401(1)(b)(i), which states that chiropractors are authorized to engage in "[d]iagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference," and § 16401(1)(b)(iii), which states that chiropractors are permitted to use "analytical instruments . . . regulated by rules promulgated by the board."

The trial court ruled that thermographic devices are excluded from the scope of chiropractic for two reasons: (1) "there is no evidence that thermographic devices of any type, in and of themselves, locate subluxations," and (2) thermographic devices are not scientifically valid.

We do not dispute the trial court's factual finding that "there is no evidence that thermographic devices of any type, *in and of themselves,* locate subluxations." Indeed, it is clear from the record that thermographic devices only measure heat differentials, which may or may not be the product of a subluxation. Nevertheless, we disagree with

[12] Liquid crystal thermography uses liquid crystals that change color depending on skin temperature to depict the differentials in skin surface temperature. Electronic infrared thermography is described as a more sophisticated, state-of-the-art procedure that uses a camera and produces a thermogram showing the differentials in skin temperature over the different regions of the body.

[13] E.g., infectious processes, vascular diseases, tumors, hematomas, scratches, fractures, surgery, perspiration, phlebitis, arthritis, and other causes.

the trial court's conclusion concerning the legal significance of this finding. One of the principal arguments advanced by ACIA, both below and on appeal, is that thermographic devices are prohibited because their use involves "differential diagnosis," a procedure that the Supreme Court in *Beno* said chiropractors are not authorized to perform. In this context, it appears that the trial court assumed that because thermographic devices do not locate spinal subluxations "in and of themselves," the devices therefore are used for differential diagnosis and thus prohibited by *Beno.*

We conclude, however, that the differential diagnosis prohibited by *Beno* is only the differential diagnosis of "non-spinal areas," a distinction the trial court did not make. We reach this conclusion for two reasons. First, the discussion of differential diagnosis in *Beno* is limited to procedures involving nonspinal areas only. See *Beno, supra,* 422 Mich 312-315, 325-327. Second, the statutory definition of "practice of chiropractic" expressly includes the authority to perform "spinal analysis," § 16401(1)(b)(i), and also the authority to use "analytical instruments," § 16401(1)(b)(iii). The board's definition of analytical instruments, which is cited with approval in *Beno, supra* at 336, is as follows:

> "Analytical instruments" means instruments which monitor *the body's physiology* for the purpose of determining subluxated or misaligned vertebrae or related bones and tissues. [1982 AACS, R 338.12001(b). Emphasis added.]

Construed together, these provisions indicate that a chiropractor's diagnostic authority includes the authority to perform "spinal analysis," which encompasses "monitor[ing] the body's physiology for the purpose of determining subluxated or misa-

ligned vertebrae or related bones and tissues."
However, because § 16401(1)(b)(i) refers only to
"spinal" analysis, and because the board's defini-
tion of analytical instruments may not be con-
strued more broadly than the terms of the autho-
rizing statute, *Beno, supra* at 334, a chiropractor's
authority to analyze and monitor the body's phy-
siology necessarily is limited to the spinal area
only, a conclusion that is consistent with the *Beno*
proscription against differential diagnosis of non-
spinal areas.

Accordingly, we conclude that both liquid crystal
thermography and infrared thermography are ex-
cluded from the scope of chiropractic because nei-
ther procedure is functionally limited to an analy-
sis of the spine. To the contrary, both procedures
involve the detection and analysis of heat differen-
tials over entire regions of the body, including the
arms, legs, and head. As we have discussed, the
diagnostic authority of a chiropractor does not
extend to an analysis of the body's physiology, or
other alleged effects of a subluxation, in nonspinal
areas. To allow such analysis would require the
differential diagnosis of localized ailments in those
nonspinal areas, a type of diagnosis that is not
contemplated by § 16401(1)(b)(i) or permitted by
*Beno.*

On the other hand, all the hand-held instru-
ments used in dermathermography are limited in
function to the spine only. These instruments
monitor the body's physiology by measuring a
person's skin temperature at each spinal level for
the purpose of determining subluxated or misa-
ligned vertebrae. The analysis associated with the
use of these instruments thus is limited to "spinal
analysis." This type of analysis does not require a
chiropractor to diagnose the alleged effects of
nerve interference in nonspinal areas and, hence,

would not require the differential diagnosis of localized ailments in nonspinal areas. We conclude, therefore, that the use of these hand-held instruments, limited to the analysis of the spine, is permitted by §§ 16401(1)(b)(i) and (iii).

As noted above, the trial court also ruled that thermographic devices are excluded from the scope of chiropractic because they are not scientifically valid, a conclusion that was derived mainly from the trial court's finding that thermographic devices are not efficient in diagnosing subluxations. However, the relevancy of that inquiry helps to determine whether the instruments are prohibited by § 16423(2). As noted previously, the trial court construed § 16423(2) as requiring "that both preconditions be satisfied" and, therefore, found it necessary to address independently the "nationally recognized standards" prong of that statute. As we held earlier, however, an analytical instrument is not prohibited by § 16423(2) if just either one of the two statutory criteria are satisfied (i.e., the instrument meets nationally recognized standards or is approved by the board of chiropractic). In this case, the hand-held instruments in question have all been approved by the board of chiropractic. Therefore, the instruments are not prohibited by § 16423(2).

We agree, however, that consideration of the efficacy of the hand-held instruments may be relevant in determining whether the expenses associated with those instruments constitute allowable no-fault expenses under § 3107 of the no-fault statute. However, the trial court did not consider specifically the issue in this context, and, absent specific findings and absent an opportunity for the parties to address that matter, we decline to make such a finding ourselves. Moreover, for the reasons discussed in part IV(B), *post* at 93-94, a remand for

consideration of the applicability of § 3107 with respect to other items that are included within the scope of chiropractic is required on independent grounds.

IV

### THE ISSUE OF OTHER DEFENSES

This issue involves the question whether, aside from the "scope of chiropractic" question, ACIA may contest plaintiffs' entitlement to money damages for those products and services that were furnished by them to ACIA's insureds, but for which they did not receive payment from ACIA, by asserting other defenses it may have to payment. Two categories of "defenses" are presented. Included in the first category are certain classic legal defenses such as the statute of limitations, the absence of a valid assignment from an individual insured, and prior payment or settlement. Included in the second category are those "defenses" that are unique to a no-fault action, such as the reasonableness of a given no-fault charge or the reasonable necessity of a given product or service. See MCL 500.3107; MSA 24.13107. Because of substantive differences in the treatment of these "defenses," we will discuss them separately.

A

### CLASSIC LEGAL DEFENSES

Discussions were held throughout the course of trial concerning ACIA's ability to present other defenses to payment, such as the statute of limitations, prior payment or settlement, or by showing that plaintiffs lacked a valid assignment from a patient-insured. Plaintiffs argued that ACIA waived these defenses by failing to plead them.

It is well-settled that defenses that go beyond rebutting a plaintiff's prima facie case must be pleaded, or they are waived. *Campbell v St John Hosp,* 434 Mich 608, 616; 455 NW2d 695 (1990); MCR 2.111(F). See also MCR 2.112(A)(2). We reject ACIA's argument that it was not required to plead its other defenses because plaintiffs' complaint sought only declaratory relief and did not seek money damages. First, this argument is factually incorrect, because a review of plaintiffs' complaint discloses that it does in fact contain a request for money damages. Second, ACIA's argument is without legal support because, under MCR 2.605(F), a court is empowered to grant money damages as are necessary or proper in a declaratory judgment action. *Stein v Continental Casualty Co,* 110 Mich App 410, 426; 313 NW2d 299 (1981).

ACIA also contends that it was not required to plead its other defenses because plaintiffs' complaint was deficient in that it did not specify the particular patients on whose behalf they were seeking no-fault benefits. The remedy for that situation, however, was to file a motion for a more definite statement, pointing out the defects complained of and the details desired. MCR 2.115(A). Such a motion is required to be filed before a responsive pleading is filed. *Id.* Here, no such motion was filed.

We also disagree with ACIA's contention that it was entitled to present other defenses pursuant to the terms of the final pretrial order. The reference to other defenses in the pretrial order appears only in the context of ACIA's discussion of its case. The pretrial order does not indicate that there was any determination made or agreement reached that ACIA's other alleged defenses were preserved and properly could be asserted at trial.

ACIA also argues that it should have been per-

mitted to amend its answer at trial to add its other defenses. The record indicates that when ACIA moved to amend its answer at trial, the trial court took the motion under advisement, but, in the meantime, did not foreclose ACIA from presenting evidence of its other defenses. ACIA subsequently presented evidence indicating that it had investigated the existence of other defenses, but, as it concedes in its brief on appeal, it never litigated the actual merits of any given defense.[14] Instead, ACIA maintained that the issue of other defenses was required to be litigated in a separate action or proceeding. When the trial court disagreed with this position, ACIA moved for a continuance, but the motion was denied. ACIA did not present thereafter evidence establishing its other alleged defenses. The record indicates that the trial court never squarely decided the amendment issue, apparently finding it unnecessary in light of ACIA's failure to present evidence establishing its other alleged defenses despite the opportunity to do so.

On appeal, ACIA continues to maintain its position that it was not required to litigate the merits of its other defenses at trial and that those matters were instead required to be litigated in a separate action or proceeding. We disagree.

First, we again reject ACIA's argument that this action was limited only to a declaratory judgment action concerning the scope of chiropractic and was not an action for money damages. As mentioned previously, plaintiffs' complaint expressly requests an award of money damages and, further, MCR 2.605(F) explicitly recognizes that a trial court properly may award money damages in a

---

[14] ACIA's witness, Paula Trueman, testified that she was instructed to review each individual file and prepare a list of any potential defenses to payment that ACIA might have.

declaratory judgment action. Acia also suggests that it did not wish to prolong trial by holding separate minitrials concerning the validity of each specific no-fault claim. However, we are unaware of any authority holding that, absent some agreement or stipulation, a party unilaterally may elect to present only a portion of its case at trial and, at the same time, reserve its right to litigate the remaining portion at a separate proceeding in the future. There was no agreement in this case that only the declaratory judgment portion of plaintiffs' action would be litigated or that the issue of plaintiffs' entitlement to money damages could be litigated at a separate proceeding in the future.

Furthermore, we disagree with Acia's assertion that, because the merits of its other defenses were never litigated, res judicata does not bar future litigation of its other alleged defenses in a separate action. Unlike collateral estoppel, which bars relitigation of only those issues actually decided, res judicata bars relitigation of claims, and Michigan has adopted the broad application of res judicata, barring both those claims actually litigated and those claims arising out of the same transaction that could have been litigated, but were not. *Schwartz v City of Flint,* 187 Mich App 191, 194; 466 NW2d 357 (1991); *West Michigan Park Ass'n Inc, v Fogg,* 158 Mich App 160, 164; 404 NW2d 644 (1987). Any defenses that Acia has to payment are directly relevant to the validity of plaintiffs' claims, and, therefore, res judicata operates to bar relitigation of those claims.

Accordingly, because Acia failed to present evidence establishing its other alleged defenses when it had the opportunity to do so, and because we reject Acia's argument that those other defenses properly may be litigated in a separate action, we conclude that plaintiffs' entitlement to money

damages is unaffected by any other alleged defenses to payment that ACIA may have.

B

SECTION 3107 NO-FAULT "DEFENSES"

Section 3107 of the no-fault statute provides that no-fault benefits are payable only for "[a]llowable expenses," which are defined as "all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." MCL 500.3107; MSA 24.13107. A dispute arose at trial concerning who had the burden of proof with respect to whether a given charge was reasonable or whether a given product or service was reasonably necessary. The trial court ultimately sided with plaintiffs, ruling that the burden of proving that a charge was not reasonable or that a given product or service was not reasonably necessary was on ACIA. Moreover, when the trial court thereafter awarded plaintiffs no-fault benefits for those products and services that were found to be within the scope of chiropractic, it did so without considering whether the expenses involved were reasonable and the products and services were reasonably necessary.

After the trial court issued its decision, our Supreme Court addressed these matters in *Nasser,* 435 Mich 49-50, stating:

> Under this statutory scheme, an insurer is not *liable* for any medical expense to the extent that it is not a reasonable charge for a particular product or service, or if the product or service itself is not reasonably necessary. The plain and unambiguous language of § 3107 makes both reasonableness and necessity *explicit and necessary elements of a*

*claimant's recovery,* and thus renders their absence a defense to the insurer's liability. In addition, *the burden of proof on these issues lies with the plaintiff.*

\* \* \*

. . . Where a plaintiff is unable to show that a particular, reasonable expense has been incurred for a reasonably necessary product or service, there can be no finding of a breach of the insurer's duty to pay that expense, and thus no finding of liability with regard to that expense. [Emphasis added.]

The Supreme Court further held that whether an expense is reasonable or necessary is generally a question for the trier of fact. *Id.*

Here, the trial court erroneously ruled that plaintiffs did not have the burden of establishing the necessary elements of reasonableness and necessity, and then proceeded to find ACIA liable for the payment of no-fault benefits without deciding whether those necessary elements had been established. Under *Nasser,* ACIA may not be held liable for any expense that is not both reasonable and necessary. Because these matters involve questions of fact that were not considered by the trial court, we reverse the trial court's award of money damages to each plaintiff and remand the case to the trial court for resolution of the issues of reasonableness and necessity.

V

FAILURE TO ADD THE MICHIGAN CHIROPRACTIC LEGAL ACTION COMMITTEE AS A PARTY

Both plaintiffs are members of the Michigan Chiropractic Legal Action Committee (MCLAC). Although both plaintiffs brought this lawsuit in their individual capacities, they apparently were chosen

to do so by the MCLAC, which is financing the lawsuit. ACIA argues that the trial court erred in denying its motions to add the MCLAC as a party with respect to the declaratory judgment portion of this action.

A trial court's decision to add or drop a party to an action is reviewed for an abuse of discretion. *Wiand v Wiand,* 205 Mich App 360, 369; 522 NW2d 132 (1994).

ACIA first argues that the MCLAC was required to be added as the real party in interest. MCR 2.201(B). We disagree. A real party in interest is one who is vested with the right of action on a given claim, although the beneficial interest may be in another. *Stephenson v Golden,* 279 Mich 710, 766; 276 NW 849 (1937); *Michigan Nat'l Bank v Mudgett,* 178 Mich App 677, 679; 444 NW2d 534 (1989). In *Rite-Way Refuse Disposal, Inc v Vanderploeg,* 161 Mich App 274, 278; 409 NW2d 804 (1987), this Court, quoting from 2 Martin, Dean & Webster, Michigan Court Rules Practice, p 6, stated:

> "The purpose of the [real party in interest] rule is to protect the defendant by requiring that the claim be prosecuted by the party who by the substantive law in question owns the claim asserted against the defendant."
>
> \* \* \*
>
> "*The real party in interest rule is concerned only with the power of the plaintiff before the court to bring suit upon the claim stated. Whether additional parties also have an interest, such that their joinder is required or the plaintiff is prohibited from proceeding without them, is not a question of real party in interest, but of necessary joinder of parties under MCR 2.205.*"

Here, each of the claims asserted by plaintiffs

relate to products or services that were provided by them personally to ACIA's insureds and for which they billed ACIA but were denied payment. The fact that the MCLAC may be financing this lawsuit does not change the fact that the asserted claims belong only to plaintiffs. Therefore, plaintiffs are the real parties in interest. As explained in *Rite-Way Refuse Disposal, Inc,* whether the MCLAC also has an interest in the subject matter of this lawsuit is not a question of real party in interest, but one of necessary joinder under MCR 2.205.

ACIA next argues that the MCLAC is a necessary party that was required to be joined under MCR 2.205. ACIA asserts that "the intent of MCR 2.205 is to require joinder of any entity which *should* be joined for purposes of good judicial administration" (emphasis supplied by ACIA). We disagree and find that ACIA's reading of MCR 2.205 is overly broad.

MCR 2.205(A) states that joinder is required of all parties "having such interests in the subject matter of an action that their presence in the action is *essential* to permit the court to render complete relief" (emphasis added). As this Court found in *Troutman v Ollis,* 134 Mich App 332, 339-340; 351 NW2d 301 (1984), where a party's presence in the action is not essential to the court rendering complete relief, factors such as judicial economy or avoidance of multiple litigation are not enough to compel joinder.

Here, the rights and legal obligations of which plaintiffs seek a determination in the declaratory judgment portion of this action are rights and obligations arising out of their own personal relationship with ACIA. Notwithstanding any common interest the MCLAC may have in the subject matter of this action, its joinder is not essential to a

determination of the rights and obligations between plaintiffs and ACIA, nor to permit the court to render complete relief. Therefore, the MCLAC may not be compelled to join this action as a necessary party.

ACIA also argues that the MCLAC should have been joined as a permissive party defendant with respect to its counterclaim for declaratory relief. MCR 2.206(A)(2). Aside from the question of joinder, however, in order to properly maintain an action for declaratory relief against the MCLAC, ACIA was required to demonstrate the presence of an "actual controversy" between it and the MCLAC. *Shavers v Attorney General,* 402 Mich 554, 588; 267 NW2d 72 (1978). An actual controversy exists where a declaratory judgment is necessary to guide a party's future conduct in order to preserve his legal rights. *Id.* A case or actual controversy does not exist where the injuries sought to be prevented are merely hypothetical. *McGill v Automobile Ass'n of Michigan,* 207 Mich App 402, 407; 526 NW2d 12 (1994).

Here, the declaratory judgment portion of ACIA's countercomplaint alleges that plaintiffs have billed ACIA for products and services that allegedly are outside the scope of chiropractic. ACIA requests a determination that it is not liable for those expenses. These allegations establish an actual controversy between plaintiffs and ACIA. On the other hand, ACIA's countercomplaint does not contain any allegations involving the MCLAC. Moreover, the mere fact that the MCLAC happens to advocate a position contrary to ACIA's demonstrates neither the presence of a legal relationship between ACIA and the MCLAC nor an actual controversy concerning any rights or obligations between ACIA and the MCLAC that need to be resolved. Therefore, because ACIA failed to demonstrate the presence of an

actual controversy between it and the MCLAC, it could not properly maintain a declaratory judgment action against the MCLAC. Accordingly, the trial court did not abuse its discretion in failing to add the MCLAC as a permissive party defendant with respect to the declaratory judgment portion of ACIA's counter-complaint.

VI

### THE § 3157 OVERCHARGE ISSUE: LIABILITY AND DAMAGES

For one of its counterclaims, ACIA alleged that both plaintiffs violated MCL 500.3157; MSA 24.13157, by charging more for products and services in cases involving no-fault insurance than they customarily charged in cases not involving insurance. The trial court found that both plaintiffs indeed had violated § 3157 and awarded ACIA damages of $67,859.20 for services other than x-ray services and $23,798.80 for x-ray services against plaintiff Hofmann, and $38,173.20 for services other than x-ray services and $8,003.20 for x-ray services against plaintiff Herfert.[15] On appeal, plaintiffs challenge the trial court's finding that § 3157 was violated, and both sides challenge the trial court determination of damages.

This Court reviews a trial court's findings of fact in a bench trial under the clearly erroneous standard. MCR 2.613(C); *Tuttle v Dep't of State Hwys*, 397 Mich 44, 46; 243 NW2d 244 (1976); *Hawkins v Smithson*, 181 Mich App 649, 651-652; 449 NW2d 676 (1989). The clearly erroneous standard also

[15] These amounts are taken from the trial court's written opinion, inasmuch as the judgment merely lists the total amount of damages that were awarded to ACIA for all of its counterclaims, without a breakdown of the separate damage awards for the individual counterclaims.

applies to a finding with regard to the amount of damages. *Precopio v Detroit,* 415 Mich 457, 467; 330 NW2d 802 (1982). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake was made. *Tuttle, supra.* In applying this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. MCR 2.613(C); *Attorney General ex rel Director of Dep't of Natural Resources v ACME Disposal Co,* 189 Mich App 722, 724; 473 NW2d 824 (1991).

We first will address plaintiffs' claim that the trial court erred in admitting into evidence various "damage summary" exhibits that ACIA offered as summaries of the billing and payment information contained in several hundred patient medical files and insurance-claim files.

The decision whether to admit evidence is within the sound discretion of the trial court. *Gore v Rains & Block,* 189 Mich App 729, 737; 473 NW2d 813 (1991). Plaintiffs argue that the summary exhibits were inadmissible because they did not meet the criteria for admissibility under MRE 1006, which provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Because MRE 1006 is identical to its federal counterpart, FRE 1006, federal authorities examining the federal rule may be looked to for guidance. See

*People v Malone,* 445 Mich 369, 385-386; 518 NW2d 418 (1994).

In *White Industries v Cessna Aircraft Co,* 611 F Supp 1049, 1070 (WD Mo, 1985), which is cited by both sides, the court listed four requirements that must be satisfied before a document may be admitted as a Rule 1006 summary:

> First, the summary must be of "voluminous writings, recordings or photographs which cannot be conveniently examined in court." . . .
> Second, . . . the underlying "writings, recordings or photographs" must themselves be admissible in evidence. . . .
> Third, the originals or duplicates of the underlying materials must be made available for examination or copying by the other parties, at a reasonable time and place. . . .
> Finally, . . . a summary must be an *accurate* summarization of the underlying materials. [Emphasis in original.]

In this case, plaintiffs' arguments do not implicate either of the first two criteria. Although plaintiffs complain that the underlying files for exhibits 428A-1 and A-2 and 431A-1 and A-2 were not made available until midtrial, MRE 1006 merely requires that underlying materials be made available for examination at a "reasonable time." In *Northwest Acceptance Corp v Almont Gravel, Inc,* 162 Mich App 294, 305-306; 412 NW2d 719 (1987), this Court found no error where the trial court permitted the plaintiff to review the underlying documents during trial. Here, upon request by plaintiffs, ACIA was ordered to make the underlying files available to plaintiffs before the rebuttal portion of their case. Plaintiffs do not claim that they were prejudiced by any delay in the production of the files. Absent any demonstra-

tion of prejudice, plaintiffs are not entitled to appellate relief. See MRE 103(a) (error may not be predicated upon a ruling admitting evidence unless a substantial right of the party is affected).

Plaintiffs also direct our attention to a portion of the record where ACIA's summary witness testified that some of the listings in the exhibits might involve claims that were outside the six-year period of limitation. However, the record indicates that this same witness later testified that she rechecked the summary exhibits and deleted any payments that were made beyond the six-year period. Plaintiffs also argue that exhibits 428A-1, A-2, and B and 431A-1, A-2, and B were "defective" because they did not contain information that plaintiffs contend was necessary in order to determine whether there had been an impermissible overcharge. However, those exhibits were offered only for the purpose of showing the total amount of no-fault benefits that ACIA had paid to plaintiffs, not for the purpose of showing whether those amounts constituted an impermissible overcharge. Thus, plaintiffs' arguments concerning the admissibility of exhibits 428A-1, A-2, and B and 431A-1, A-2, and B are without merit.[16]

Next, plaintiffs contend that exhibits 305, 306, 309, 310, and 311 were all inadmissible because some of the data in those exhibits were based on assumptions and also because the exhibits were

---

[16] Regarding exhibits 428B and 431B, plaintiffs also state, without elaboration: "Note Trueman's admission that her charts contain bare listings of 1099 payments to the plaintiffs prepared at the last minute, with no backup patient files, the files being destroyed, lost or unavailable." Standing alone, this statement is insufficient to present properly for our consideration the question whether exhibits 428B and 431B were properly admitted. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). We note that, contrary to what plaintiffs suggest, exhibits 428B and 431B were offered as summaries, not of the information contained in the original claims files, but of the payment information contained in the 1099s.

inaccurate because they failed to reflect various factors that plaintiffs contend were necessary in order to properly interpret the data. However, assumptions in summaries are not impermissible per se. *United States v Jennings,* 724 F2d 436, 442 (CA 5, 1984). Where there is an evidentiary basis for the assumptions, objections are relevant to weight, not admissibility. *Id.* Cf. *Joba Construction Co, Inc v Burns & Roe, Inc,* 121 Mich App 615, 628; 329 NW2d 760 (1982).

For the most part, plaintiffs' complaints do not implicate the accuracy of the underlying data, but rather the legal significance of that data. ACIA's summary witness was extensively cross-examined at trial concerning his preparation of the various damage summaries, the assumptions employed, the factors that were considered and not considered, and how the inclusion or exclusion of certain information might influence the results. While some of the matters discussed by plaintiffs admittedly might raise some concern in a jury trial, because this was a bench trial and because the trial court was fully capable of considering the matters in exercising its discretion whether to admit the summaries and in assigning the weight to be given the evidence, we decline to find that the trial court's decision to admit the damage summaries amounted to an abuse of discretion. See *White Industries, supra,* 611 F Supp 1073 (observing that an objection that might render a summary exhibit inadmissible in a jury trial does not preclude necessarily admission in a bench trial, given that a judge is capable of considering the exhibit for whatever limited purpose it may serve).

We will now consider the merits of the § 3157 issue. MCL 500.3157; MSA 24.13157 provides:

> A physician, hospital, clinic or other person or
> institution lawfully rendering treatment to an
> injured person for an accidental bodily injury
> covered by personal protection insurance . . . may
> charge a reasonable amount for the products, ser-
> vices and accommodations rendered. *The charge
> shall not exceed the amount the person or institu-
> tion customarily charges for like products, services
> and accommodations in cases not involving insur-
> ance.* [Emphasis added.]

Because a no-fault insurer's liability for pay-
ment of no-fault benefits is subject to the require-
ments of the no-fault statute, MCL 500.3105(1);
MSA 24.13105(1); *Cherry, supra,* 195 Mich App
318, and because § 3157 unambiguously provides
that a health-care provider's charge for products,
services, or accommodations in cases covered by
no-fault insurance "*shall not* exceed the amount
. . . customarily charge[d] . . . in cases not involv-
ing insurance," it follows that a no-fault insurer is
not liable for the amount of any charge that
exceeds the health-care provider's customary
charge for a like product, service, or accommoda-
tion in a case not involving insurance.

At trial, ACIA divided its § 3157 proofs into two
different categories, services other than x-ray ser-
vices and x-ray services. We will analyze each
category separately.

### A

#### SERVICES OTHER THAN X-RAY SERVICES

The evidence presented in connection with this
category consisted of the actual billing and pay-
ment information contained in the plaintiffs' pa-

tient medical files,[17] testimony from plaintiffs themselves concerning their charging and billing practices, and testimony from former patients of each plaintiff. After discussing all the evidence, the trial court found:

> [T]he only entities from whom Plaintiffs collect their so-called "customary charges" are no-fault and workers' compensation insurers.
>
> The Court finds that in almost 100% of the cases [not involving insurance] the Plaintiffs do not receive their so-called customary charge.

An analysis of each plaintiff's billing and charging practices clearly and unmistakably reveals, consistent with the trial court's finding, that each plaintiff charged a higher fee for his products and services in cases where no-fault insurance was available than he did in cases not involving insurance. Indeed, plaintiffs do not even dispute this circumstance on appeal. Rather, they claim that they did not violate § 3157 because the amount charged to ACIA was their true "customary charge," and they simply agreed to accept lesser amounts from patients who did not have reimbursable insurance, inasmuch as those patients could not afford to pay the so-called "customary charge." We reject this reasoning on both legal and factual grounds.

First, from a legal standpoint, whether there has been an impermissible § 3157 overcharge is determined by looking to the provider's customary charge "in cases not involving insurance." Thus, a provider cannot avoid committing a § 3157 over-

---

[17] In addition to examining the billing information contained in the patient files of persons who were ACIA's insureds, ACIA was also allowed to examine approximately one hundred randomly selected patient files from each plaintiff for patients who were not covered by no-fault insurance. All of the patient information was deleted from these latter files in order to protect patient confidentiality.

charge violation simply by claiming, as plaintiffs attempt to do here, that the amount charged in a no-fault case is the "customary charge," when in fact the provider customarily charges a lesser amount in cases not involving insurance.

Second, we also reject plaintiffs' argument on factual grounds in light of the following findings made by the trial court:

> I specifically find that Dr. Hofmann and Dr. Herfert did not charge less or receive less in payment because of a person's inability to pay. The key to lower payment was whether or not the person had reimbursable third-party payor coverage. Many, if not most, of the patients of the plaintiffs were employed or their spouse was employed. A lower rate was given to these patients only because they had no reimbursable insurance.

These findings are supported by the numerous evidentiary materials discussed throughout the trial court's opinion, as well as the testimony of former patients of each plaintiff, which we find particularly enlightening.

For instance, one of plaintiff Hofmann's former patients, Kathryn Gusfa, testified that she was told that she could receive treatment for a reduced rate of $12 a visit because her insurance did not cover office visits. Gusfa, whose husband was employed, said that no one ever inquired about her financial situation or her ability to pay the so-called standard charge.

Another patient, Maria Barbantini, testified that she received treatment from Dr. Hofmann under a Family Life Plan that allowed both her and her husband, who was employed, to receive treatment for a total of $15 an office visit. After Barbantini was involved in an automobile accident, Dr. Hofmann began charging ACIA $27 an office visit.

When Barbantini finished treating for her automobile accident injuries, Dr. Hofmann again charged her only $15 a visit. Although Dr. Hofmann testified that the Family Life Plan was available only to patients who could not afford the standard charge, Barbantini denied ever being told this and further claimed that she and her husband would not have paid a reduced rate had they been told.

One of plaintiff Herfert's former patients, Maria D'Amico, testified that she treated with Dr. Herfert on a weekly basis for over two years and was charged $20 each time. D'Amico subsequently requested that her medical records be sent to ACIA, because she believed that her injuries were related to an earlier automobile accident. D'Amico had never mentioned the automobile accident to Dr. Herfert. According to D'Amico, Dr. Herfert's office manager became upset and told her that she should have told the office in the beginning that her injuries were related to an automobile accident. When D'Amico asked what difference it made, she was told that the charge is different for an "accident case" and would have been $50 instead of $20.

Toshiko Stamper treated with Dr. Herfert for over a year for injuries she received in an automobile accident, and Dr. Herfert charged ACIA $65 an office visit during this period. After Stamper was discharged as an automobile-accident patient, she continued treating with Dr. Herfert as a "cash-paying" patient, but was charged only $20 an office visit for what she claimed was the same type of treatment she had received when she was being treated for the automobile-accident injuries. Stamper denied ever agreeing to pay a lesser amount because she could not afford to pay more. Rather, she stated, "[The receptionist] say, $20, so I pay $20."

This testimony, together with the other evidence discussed throughout the trial court's written opinion, supports the trial court's finding that the key to lower payment was the absence of reimbursable insurance, not a patient's inability to pay the so-called customary charge.

Plaintiffs also argue that they did not violate § 3157 because they did not charge ACIA "beyond what was charged to any other health insurer." Again, this argument must fail on legal grounds, given that the relevant inquiry under § 3157 is not the amount that is customarily charged to other health insurers, but rather the amount that is customarily charged "in cases not involving insurance."

Accordingly, for the reasons stated, we conclude that the trial court did not clearly err in finding that both plaintiffs violated § 3157 with regard to services other than x-ray services.

We now turn to the issue of damages. ACIA showed through exhibits 428A-1, A-2, and B and 431A-1, A-2, and B, that it paid plaintiffs Herfert and Hofmann no-fault benefits of $95,433 and $169,648, respectively, for services other than x-ray services. The trial court determined that forty percent of those amounts represented the extent of the § 3157 overcharge and, consequently, awarded ACIA damages of $38,173.20 from plaintiff Herfert and $67,859.20 from plaintiff Hofmann for services other than x-ray services.

Both sides argue that the trial court erred in its determination of damages. ACIA contends that the amount of damages awarded is erroneously low. Plaintiffs, on the other hand, claim that ACIA is barred from recovering any damages whatsoever because it failed to sustain its burden of proving its damages with reasonable certainty. We con-

clude that the trial court's determination of damages is not clearly erroneous. *Precopio, supra.*

A party asserting a claim has the burden of proving its damages with reasonable certainty. *S C Gray, Inc v Ford Motor Co,* 92 Mich App 789, 801; 286 NW2d 34 (1979). Although damages based on speculation or conjecture are not recoverable, *Sutter v Biggs,* 377 Mich 80, 86; 139 NW2d 684 (1966), damages are not speculative merely because they cannot be ascertained with mathematical precision. *Godwin v Ace Iron & Metal Co,* 376 Mich 360, 368; 137 NW2d 151 (1965). It is sufficient if a reasonable basis for computation exists, although the result be only approximate. *McCullagh v Goodyear Tire & Rubber Co,* 342 Mich 244, 255; 69 NW2d 731 (1955). Moreover, the certainty requirement is relaxed where the fact of damages has been established and the only question to be decided is the amount of damages. *Bonelli v Volkswagen of America, Inc,* 166 Mich App 483, 511; 421 NW2d 213 (1988).

In order to determine the amount of § 3157 damages, the trial court was required to determine the difference between the amount that ACIA paid to plaintiffs and the amount that plaintiffs "customarily charge[d]" in cases not involving insurance. It was this latter determination that proved to be difficult, primarily because the evidence showed that both plaintiffs routinely charged different amounts for the same product or service.

At trial, ACIA presented exhibits 305 and 306. These exhibits summarized the billing and payment information contained in plaintiffs' patient files and showed the following differences in the average amount that was paid to each plaintiff for each patient visit for treatment of a condition not arising out of an automobile accident and the average charge to ACIA for each patient visit for

treatment of a condition arising out of an automobile accident:

|                            | Hofmann | Herfert |
|----------------------------|---------|---------|
| Average non-auto payment   | $ 7.44  | $15.45  |
| Average charge to ACIA     | 38.23   | 53.33   |

ACIA argues that the average amount paid to each plaintiff for treatment in cases not involving an automobile accident (i.e., $7.44 and $15.45) represents the "customary charge" against which the average amount that was charged to it ($38.23 and $53.33) should be measured, thereby revealing a percentage of overcharge of eighty-one percent for Dr. Hofmann and seventy-one percent for Dr. Herfert. We disagree.

The data used to calculate the average nonautomobile payment included payments that both plaintiffs received from certain third-party payers, such as Medicaid, Medicare, or private health insurers, some of whom had contractual or statutory limitations on the amounts that they would pay. The amounts received from these third-party sources were less than what plaintiffs charged. In *Johnson v Michigan Mutual Ins Co,* 180 Mich App 314, 320-322; 446 NW2d 899 (1989), this Court held that, under § 3157, a no-fault insurer's liability for payment of a health-care provider's customary charge is not limited to what Medicaid would have paid had the insured not been injured by an automobile. Under *Johnson,* a trial court would not be justified in using amounts that are subject to third-party contractual or statutory limitations as a benchmark for determining the extent of a no-fault insurer's liability for payment of a health-care provider's customary charge.

Accordingly, because the calculations in ACIA's exhibits 305 and 306 were based in part on

amounts received from certain third-party payers with contractual or statutory limitations, and because inclusion of those amounts had the effect of skewing the end calculations in ACIA's favor, the trial court was justified in rejecting, as it did, the eighty-one percent and seventy-one percent overcharge percentages reflected in those exhibits. We must still determine, however, whether the trial court's adoption of a forty percent overcharge percentage was proper.

We find enlightening plaintiff Hofmann's exhibit 198, which summarized the billing information contained in approximately one hundred randomly selected files for patients who were not covered by no-fault insurance. This exhibit demonstrated that the average "charge" for each patient visit for treatment of a condition not arising out of an automobile accident was $27.38, which, when measured against the average charge to ACIA of $38.23 for each patient visit for treatment of a condition arising out of an automobile accident, reflects a percentage of overcharge of twenty-eight percent.[18] However, ACIA also presented evidence indicating that Dr. Hofmann's so-called listed "charges" were not in fact the amounts that he customarily accepted from his patients. In light of this evidence, the trial court was justified in rejecting, as it did, the twenty-eight percent overcharge percentage reflected in exhibit 198.

We conclude, therefore, that an evidentiary basis existed to support the trial court's rejection of the percentage of overcharge figures reflected in the parties' respective exhibits. Although the evidence admittedly does not lend itself to a precise determination of damages, absolute certainty is not required. As our Supreme Court observed in

_____

[18] We agree with the trial court that plaintiff Hofmann's exhibit 198, in and of itself, "clearly demonstrates that he overcharged ACIA."

*Purcell v Keegan,* 359 Mich 571, 576; 103 NW2d 494 (1960):

> [W]here injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, "in the assessment of damages require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable." [*Stimac v Wissman,* 342 Mich 20, 28; 69 NW2d 151 (1955).] Particularly is this true where it is defendant's own act or neglect that has caused the imprecision.

Here, the evidence unequivocally showed that an impermissible overcharge occurred. While it was difficult to pinpoint the precise extent of this overcharge, this difficulty was attributable in part to plaintiffs' own practices of customarily charging different amounts for the same service. The percentage of overcharge that was ultimately adopted by the trial court (i.e., forty percent) is within the range of proofs presented by the parties, and, considering all the evidence and circumstances, we are unable to conclude that this percentage is clearly erroneous. Accordingly, we affirm the trial court's award of § 3157 damages for services other than x-ray services.

### B

#### X-RAY SERVICES

ACIA's § 3157 proofs for x-ray services were entirely different from the proofs that it submitted for services other than x-ray services. Instead of comparing plaintiffs' charges for different classes of individual patients as it did with the services other than x-ray services, ACIA relied exclusively on plaintiffs' claims records with BCBSM for the

years 1982 through 1988. Those records revealed that BCBSM paid plaintiff Herfert an average of forty percent of his submitted charge for x-rays and paid plaintiff Hofmann an average of forty-four percent of his submitted charge for x-rays. According to ACIA, this indicates that plaintiffs "overcharged" BCBSM by sixty percent and fifty-six percent, respectively. Acknowledging that it was charged approximately the same amount for x-rays as plaintiffs charged BCBSM, ACIA argues that it too was therefore "overcharged" by these same percentages. The trial court determined that only forty percent of plaintiffs' charges for x-rays constituted an impermissible overcharge and awarded ACIA § 3157 damages of $23,798.80 from plaintiff Hofmann and $8,003.20 from plaintiff Herfert for x-ray services.

We agree with plaintiffs that the BCBSM claims records, standing alone, do not establish a § 3157 overcharge violation with respect to x-ray services.

ACIA's rationale for relying on the BCBSM claims records is set forth in its appellate brief:

ACIA could use BCBSM's *payments* to each Plaintiff as a "benchmark" for establishing each Plaintiff's "customary charge" for x-rays because:

—The evidence established that at least 70% of each plaintiff's patients had BCBSM coverage for x-rays;

—Since Plaintiffs were participating BCBSM providers, Plaintiffs were required to accept BCBSM reimbursement as payment in full for x-rays under *Dean,* [*supra,* 139 Mich App 266];

—As a matter of logic and law, if Plaintiffs accepted BCBSM's reimbursement as payment in full for at least 70% of their patients, their "customary charge" for x-rays in non-no-fault cases was the amount they customarily "received" from BCBSM;

—Drs. Hofmann and Herfert routinely over-

> charged BCBSM 56% and 60%, respectively, for x-rays; and
>     —Since Plaintiffs charged BCBSM and ACIA the same amounts for x-rays, Plaintiffs' percentages of overcharging to BCBSM reflected the percentages of overcharging to ACIA.

We find that ACIA's reasoning is flawed.

ACIA's reasoning is premised on the principle that BCBSM's "payments" to plaintiffs for x-rays, as opposed to plaintiffs' "charges" to BCBSM for those x-rays, are the proper criteria to be used in determining the plaintiffs' "customary charge" for x-rays. This position is untenable, however, in light of the clear statutory language of § 3157, which states that a "charge" in a no-fault case "shall not exceed the amount [a] person or institution customarily *charges* for like products, services and accommodations in cases not involving insurance" (emphasis added). Thus, ACIA's reliance on the amount that was "paid" by BCBSM, as opposed to the amount that plaintiffs "charged," is unwarranted.

Furthermore, ACIA's position ignores the fact that the amounts that plaintiffs receive in payment from BCBSM are subject to contractual limitations, whereas the amounts that ACIA must pay for covered medical expenses are not limited contractually. Our Supreme Court discussed this distinction in *Auto Club Ins Ass'n v New York Life Ins Co,* 440 Mich 126, 139; 485 NW2d 695 (1992):

> One way of containing [health care] costs is for an insurer to place dollar limits upon the amounts it will pay to doctors and hospitals for particular services. While health and accident carriers generally are free to establish such limits, *a no-fault insurer is not.* Only the statutory qualification of reasonableness limits the amount that must be

paid by a no-fault carrier for covered medical expenses. [Emphasis added.]

The Court justified this distinction by noting that the obligation of a no-fault carrier is secondary to that of a health or accident insurer in situations where both types of coverage exist. *Id.*

In essence, ACIA is asking this Court to establish a rule that, in situations where other health or accident insurance coverage does not exist, the obligation of a no-fault carrier must be limited to what a health insurer would have had to pay if health insurance existed, notwithstanding that the health insurer's obligation might be controlled by contract, whereas the no-fault carrier's is not. This position does not find support in the no-fault act.

We note that the absence of contractual limitations in no-fault situations does not give health-care providers liberty to charge no-fault insurers any amount. In addition to the "customary charge" limitation discussed above, §§ 3107 and 3157 also impose a statutory qualification of reasonableness, such that a no-fault carrier is liable only for those medical expenses that constitute a reasonable charge for the product or service. *Nasser, supra,* 435 Mich 49; *McGill, supra,* 207 Mich App 406. In this case, however, ACIA has not challenged the reasonableness of the x-ray charges that comprise the basis of its § 3157 counterclaim for reimbursement.

Accordingly, because ACIA acknowledges that it was charged approximately the same amount for x-rays that plaintiffs charged BCBSM, and because ACIA did not present evidence of plaintiffs' customary charges for x-rays in other cases, we are constrained to conclude that ACIA failed to establish a § 3157 overcharge violation with respect to x-ray services. Therefore, the trial court's award of

§ 3157 damages for x-ray services is reversed and vacated.

## VII

### THE STATUTE OF LIMITATIONS ISSUE

The trial court's February 19, 1992, judgment awarded ACIA damages with respect to its various counterclaims on the basis that a six-year statute of limitations was applicable. However, relying on this Court's decision in *Auto Club Ins Ass'n v New York Life Ins Co,* 187 Mich App 276; 466 NW2d 711 (1991), the trial court subsequently issued an order amending the judgment to provide that ACIA's counterclaims for reimbursement would be "governed by the one-year period of limitations set forth within the no-fault act, MCL 500.3145(1); MSA 24.13145(1)." The order further provided, in pertinent part:

> IT IS FURTHER PROVIDED that this Order Amending the Judgment Entered on February 19, 1992, shall remain in force only until such time as the Court of Appeals' decision in *Auto Club Ins Ass'n v New York Life Ins Co,* 187 Mich App 276 (1991), is reversed by the Michigan Supreme Court.

On June 30, 1992, our Supreme Court issued its decision in *Auto Club Ins Ass'n v New York Life Ins Co, supra,* 440 Mich 126, reversing the decision of this Court. In light of our Supreme Court's reversal, the order amending the judgment, pursuant to its terms, is no longer in force. Because of this situation, and because plaintiffs have not cross appealed the conditional nature of the order, we question whether the statute of limitations issue is properly before us. However, because the parties have briefed the issue, and because the question

concerning which statute of limitations is applicable is one of law, *Westchester Fire Ins Co v Safeco Ins Co,* 203 Mich App 663, 667; 513 NW2d 212 (1994), we will address the issue.

In *New York Life,* the Supreme Court held that a no-fault insurer's common-law action as subrogee to recover benefits due under a health-care contract was governed by the six-year period of limitation applicable to contract actions, instead of the one-year period of limitation embodied in § 3145(1) of the no-fault statute. The Court explained that § 3145(1) was not applicable because that statute, by its terms, applies only to actions for the recovery of benefits "payable under this chapter." 440 Mich 138.

In this case, as in *New York Life,* none of ACIA's counterclaims for reimbursement involve actions for the recovery of no-fault benefits that are "payable under this chapter." To the contrary, each of ACIA's counterclaims are premised on the contention that reimbursement is due because the monies sought to be recovered are not payable under the no-fault statute. Therefore, we agree that § 3145(1) is not applicable.

Although ACIA's counterclaims do not involve contract actions, support for the application of a six-year period of limitation can be found in this Court's decision in *Adams v Auto Club Ins Ass'n,* 154 Mich App 186; 397 NW2d 262 (1986), which involved an insurer's action for reimbursement of overpaid work-loss benefits. Characterizing the insurer's action as a common-law action for reimbursement of payments made under mistake of fact, this Court in *Adams* stated:

> [B]ecause defendant's action seeking recovery for amounts overpaid involves a common-law right of

action, the limitation found in § 3145(1) is not applicable. Since there is no other statute of limitations directly applicable, the general six-year limitation period argued by the defendant must be applied. [MCL 600.5813; MSA 27A.5813.] Although we recognize that a strong argument to the contrary could be made, see *Badger State Mutual Casualty Co v Auto-Owners Ins Co,* 128 Mich App 120, 128-129; 339 NW2d 713 (1983), we believe that plaintiff's argument tortures the language of § 3145 and the legislative intent in enacting that section in attempting to extend the limitations period found in that section to the facts of this case involving a common-law right of action. [*Id.* at 196.]

This reasoning was expressly approved by the Supreme Court in *New York Life, supra,* 440 Mich 136-137, which also expressly disapproved the reasoning of the *Badger State* decision discussed in *Adams* as supporting the contrary view.

Accordingly, we conclude that ACIA's counterclaims are governed by the six-year limitation period prescribed by MCL 600.5813; MSA 27A.5813.

VIII

STATUTORY INTEREST

According to the parties' briefs, the parties are in agreement that any statutory interest awarded pursuant to MCL 600.6013; MSA 27A.6013 may be calculated from the date of the filing of the complaint, notwithstanding that some of the individual claims arose after the respective complaints were filed.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.