KLEIN *v.* KENT.

VENDOR AND PURCHASER—LAND CONTRACT—MENTAL COMPETENCY—
ADEQUACY OF CONSIDERATION—EVIDENCE.

> Decree for defendant purchasers of 2-flat property from 82-year-
> old widowed landlady from whom they had rented one of the
> flats for 16 years while landlady occupied the other and for
> whom defendants had performed many services including
> giving her insulin shots, repairing fences, shoveling snow,
> washing walls, painting the house, removing storm windows
> and screens, cooking her meals and doing her washing, is
> affirmed in suit to rescind a land contract, where plaintiff
> administrator failed to sustain burden of showing widow was
> not mentally competent on day the contract was executed or
> that there was an inadequacy of consideration, the record
> supporting the court's finding that the widow intended to recom-
> pense the defendants by selling at a reduced price.

Appeal from Wayne; Cash (Paul R.), J., presid-
ing. Submitted November 19, 1958. (Docket No. 76,
Calendar No. 47,665.) Decided April 14, 1959.

Bill by Martha Taylor, with case continued in the
name of John F. Klein, administrator of the estate
of Martha Taylor, deceased, against Frank W. Kent
and Flora Kent to rescind a land contract. Bill dis-
missed. Plaintiff appeals. Affirmed.

*George F. Mehling,* for plaintiff.

*John S. Gavran,* for defendants.

REFERENCES FOR POINTS IN HEADNOTE
55 Am Jur, Vendor and Purchaser § 617 *et seq.*

KELLY, J. Martha Taylor, a widow about 82 years
of age, executed a land contract, dated November 7,
1955, selling her 2-family Detroit flat to defendants.
Defendants had rented and occupied the lower flat
from 1939 and the widow had occupied the upper flat.
Martha Taylor (hereinafter referred to as deceased)
died March 5, 1956.

Plaintiff, as administrator, challenges the contract
claiming that deceased lacked mental capacity and
that the defendants had fraudulently obtained from
her property of the value of $18,000 for $11,000.
Plaintiff appeals from the decree dismissing the bill
of complaint.

Deceased was afflicted with diabetes from 1932
and on July 5, 1955, she lapsed into a diabetic coma
and was confined to the hospital for 11 days. Upon
release from the hospital she became a patient at a
nursing home, remaining at such home until Decem-
ber 21, 1955, when she was again returned to the
hospital.

While at the nursing home there were times when
she suffered definite hallucinations, but during this
period she did not have another diabetic coma. De-
ceased had lucid periods, as is disclosed by the fol-
lowing testimony of the registered nurse, who was
the owner of the nursing home:

"*Q.* And would you say that Martha Taylor's
condition was an acute case or was it just a mild case
of mental incompetency?

"*A.* That is rather difficult to answer. I would
say at the time I came over in the night it was an
acute condition.

"*Q.* But were there times when she had lucid in-
tervals?

"*A.* Oh, yes.

"*Q.* There were times when she was apparently
perfectly all right?

"*A.* That's right. She would converse with you.

"*Q.* She would converse with you intelligently?

"*A.* Yes."

The only doctor who testified stated that he had attended deceased for several years prior to her entering the nursing home; that he did not visit her while she was a patient there and could only form conclusions as to her physical and mental conditions from what those who attended her at the home had told him. In response to the court's questions, the doctor testified:

"*The Court:* What would you say, based upon your experience with her, the last time you saw her July 16, 1955, what would you say her mental condition was? I am talking about the last time you saw her?

"*A.* I think there was a marked mental deterioration. She was confused from then on, and as I say—

"*The Court:* Was she mentally incompetent?

"*A.* That is a hard thing for one doctor to say.

"*The Court:* It sure is. Well, was she able to transact business?

"*A.* I don't believe so, from the time that I saw her in July."

Deceased was at liberty to leave the nursing home as she pleased, and the contract in dispute was signed at her flat on one of her several visits there.

The contract which was signed by deceased and defendants was witnessed by Attorney Feldman and Ann Walle, a neighbor who had lived next door to deceased for several years. The testimony as to what occurred on the day of execution of the contract was confined to witness Walle, as disclosed by the following from the record:

"*Mr. Gavran* (defendants' attorney): I will call Mr. Kent.

"*The Court:* Now the deceased question will come into play.

*"Mr. Gavran:* If Mr. Kent testifies to any matters that are equally within the knowledge of the deceased.*

*"The Court:* That is right.

*"Mr. Mehling* (plaintiff's attorney): I would like at this time to interpose the objections that I have heretofore had and call the court's attention mainly that as an adverse party, he is not entitled to testify to any such matters that are equally within the knowledge of himself and the deceased.

*"The Court:* I will go with you on that. Or Mrs. Kent either.

*"Mr. Gavran:* Or their agent, or Mr. Feldman, their agent.

*"The Court:* That is right.

*"Mr. Gavran:* That closes the door, except 1 question."

Ann Walle testified that for many years defendants did "all the work that was to be done around the house;" that she heard Mr. Feldman read the contract to deceased before deceased signed it, and that after she witnessed the signatures she walked with deceased into the living room and they had a conversation about the witness' husband and son, but did not have a conversation in regard to the contract. The court then questioned Ann Walle, as follows:

*"The Court:* Did she ever talk with you before about making out this contract?

*"A.* She always told me that she wanted to sell the house to the Kents, and if they wanted it, they were the first ones.

*"The Court:* When did she tell you that?

*"A.* Oh, she had been telling me that since 1947.

*"The Court:* 1947 was the first. How many times after 1947 did she tell you that?

*"A.* Oh, there are many times."

* See CL 1948, § 617.65 (Stat Ann § 27.914).—REPORTER.

The witness Steve Raab, who had conducted a real-estate business at the same Gratiot location for 33 years and whose testimony was not challenged in any way by cross-examination, testified that he "knew her (deceased) very well;" that he went to the Kent home at the request of defendant "the first part of November of 1955;" that deceased advised him that she was going to sell her property to defendants and asked him certain questions in regard to the difference between a contract and a deed, and that at this meeting with the Kents and deceased the following occurred:

"And she (Mrs. Taylor) asked what is necessary. I don't know whether she asked, but I told her, 'If you are going to sell your property, and are going to need an attorney to draw up your papers,' and she said, 'Is that right?' and I said 'Yes.' Then—I don't recall whether price came into question immediately or not, but it did come into the question eventually. She said she was selling it to them very reasonable, "don't you think?' she said to me. I said 'Yes, it is very reasonable.' $11,000 would leave $2,000 down or somewhere in that neighborhood, but she said 'They were good to me, and I know it is worth more, but I want to sell it to them for that price,' and from there on I assumed that they went to some attorney and had their papers drawn. That is all I can remember about it. I left and they carried on from there.

"*The Court:* Did you get paid for this work?

"*A.* No, sir. This happens every day, your Honor, people come in and ask you what to do here and what to do there.

"*The Court:* You had better start charging them."

The chancellor, in sustaining his decree, filed a lengthy opinion setting forth many reasons for his holding, a few of which are set forth below:

(1) Plaintiff failed to offer any proof challenging deceased's mental condition on the day the contract was executed;

(2) Defendants matched the testimony of the ordinary nonexpert witnesses of the plaintiff (attendants at nursing home) by witnesses of the same caliber who testified deceased did her own grocery shopping, attended church regularly, and paid her own doctor bills;

(3) Defendants while occupying the lower flat had through the years rendered many services for deceased, such as giving her insulin shots, repairing fences, shoveling snow, washing walls, painting the house, removing storm windows and screens, and often cooking her meals and doing her washing;

(4) The testimony of several witnesses, whose testimony cannot be challenged, supports a conclusion that deceased at a time when there could be no question as to her mental capacity expressed repeatedly not only her gratitude for the many services defendants had rendered her through the years but, also, that she wanted "to recompense the Kents for taking care of her by selling at a reduced price."

The court concluded his opinion, stating:

"It seems to me that this money could better be spent by Mrs. Taylor in her lifetime than by building up an estate and leaving it to her relatives. A review of the events that have transpired convince me that Martha Taylor not only was not a mental incompetent but a highly shrewd business woman.

"The burden of proof is on the plaintiffs in this case to show at the time of the signing of the contract Mrs. Taylor was not in her right mind by a preponderance of the evidence. I see no testimony to establish that fact. Neither do I see any inadequacy of consideration in the disposition of this property."

The chancellor was very patient throughout the case. Extensive testimony was received and, un-

doubtedly, extensive thought was given to the question presented before the final decision of the chancellor. The record sustains the court's opinion and decree.

Affirmed. Costs to appellees.

DETHMERS, C. J., and CARR, SMITH, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.