*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THEODORE J. SKERSKI and DAWN SKERSKI,

UNPUBLISHED
January 23, 2025
9:59 AM

Plaintiffs/Counterdefendants-
Appellees,

v

No. 367318
Alpena Probate Court
LC No. 21-000057-CZ

MARILYN LUMSDEN, a protected individual, by
her conservator ELSIE WILSON,

Defendant/Counterplaintiff-Appellant.

Before: M. J. KELLY, P.J., and LETICA and WALLACE, JJ.

PER CURIAM.

In this dispute over the sale of real property, defendant, Elsie Wilson, as conservator for Marilyn Lumsden, a protected individual, appeals as of right the trial court order granting judgment to plaintiffs Dawn and Theodore Skerski for specific performance of the parties' land contract and ordering defendant to convey the subject parcel of real property to plaintiffs. We affirm.

## I. BASIC FACTS

This case involves the third time that the Lumsdens sold a parcel of land to the Skerskis. In 2000 or 2001, the Skerskis purchased 10 acres of land from the Lumsdens for $15,000 cash, and in 2004 or 2005, they purchased on a land contract an additional 10 acres for approximately $20,000 at 2 or 3% interest. The Skerskis built a house on their parcel and became neighbors with the Lumsdens. Over the years, they maintained a close, family like relationship. The Lumsdens referred to the Skerskis as their "kids" and the Skerskis felt as if the Lumsdens were grandparents to them. The parties visited each other frequently for both short and long visits and talked regularly on the telephone. As the Lumsdens got older, the Skerskis started providing them with more support. In that role, they would mow grass, plow snow, assist with visits to the emergency room, and aid the Lumsdens' daughter, Elsie Wilson, who was her parents' power of attorney, by photographing documentation related to their health and bills.

Multiple witnesses testified that the Lumsdens desired to sell another parcel of land to the Skerskis. According to the Skerskis' testimony, every time that they saw the Lumsdens they were

-1-

asked if they were ready to purchase it. Finally, in October or November 2020, the Skerskis decided that they were ready and asked the Lumsdens to "think" on a price. To that end, at Christmas, Alvin asked Elsie's husband what he thought the land was worth. Elsie's husband responded that he did not know, but suggested that it could range between $3,000 to $200,000 per acre. Alvin was shocked. He called a realtor who advised that the going rate per acre in the area was only $1,000. Believing that to still be too much, Alvin hung up. And, after relaying his conversation with the realtor to the Skerskis, he asked them to name a price. They suggested $750 an acre, but said he wanted to "knock off" an additional $50. When they refused, the Lumsdens agreed to $750 an acre.

Dawn prepared a purchase agreement and the Skerskis brought it over to the Lumsdens' house. They said that they went over the terms with the Lumsdens, who agreed to them, and that everyone signed the agreement. They left a copy of the purchase agreement with the Lumsdens. And, at the Lumsdens' request, they scheduled the date for closing with a real estate closing company. The date was initially for January 14, 2021, but it was moved to January 13, 2021 at Marilyn's request. On that day, the parties drove to the closing in separate vehicles. The real estate closing agent went over the documentation, pointing out the terms of the agreement, which included the price and interest rate. Everyone signed. Under the terms of the contract, the Lumsdens agreed to sell to the Skerskis on a five-year land contract approximately 22 acres of land for $15,000 at 2% interest.

After the contract was finalized, the Lumsdens' daughters learned of the sale for the first time. Elizabeth Kirshner stated that she had known her parents were thinking of selling and that she had told them that "now is the time" to do it. Elizabeth, who had been visiting her parents in the two-week period before the sale, stated that she understood that her parents wanted to sell to the Skerskis and use the money to pre-pay their funeral expenses. On the other hand, Elsie testified that she was shocked that it had occurred. She knew that her parents wanted to sell the property because they had repeatedly asked her to purchase it. She had to repeatedly tell them that the sale would negatively affect their healthcare. She stated that the repeated conversations was indicative of the fragility of her parents' minds and she believed that the Skerskis were aware of that fragility. She felt that her parents had been taken advantage of by the Skerskis. As a result of the sale, she initiated conservator and guardianship proceedings and was appointed as the conservator and guardian for her parents.

In the meantime, Lumsdens' granddaughter contacted the Skerskis and asked them to "reverse" the sale because she was concerned that it might affect their healthcare. The Skerskis declined to rescind the sale and, instead, opted to pay the contract off early by pre-paying for the Lumsdens' funerals. After they made all required payments, they requested that Elsie tender them a warranty deed for the property. She refused, and they filed a complaint seeking declaratory relief, specific performance, and a judgment quieting title to the land in their names. At that time, Alvin had passed away. Therefore, as conservator for her mother, Elsie filed a counter complaint, requesting that the land contract be rescinded and that the title to the property be titled in Marilyn's name.

At a May 2023 bench trial, the Skerskis presented testimony from a number of witnesses regarding the Lumsdens' mental state in the period before and during the sale. Those witnesses testified that Alvin was clear minded and could speak intelligently on a number of complex

subjects. And, although Marilyn had short-term memory issues which worsened when she was in stressful situations involving medical issues or attempts to move her to a nursing home, her mental state was normal when she was not stressed. In contrast, Elsie presented documentary evidence indicating that, as of January 21, 2021, Marilyn had "advanced dementia" and that as of March 24, 2020, Alvin's physician believed that the Lumsdens were unable to make decisions for themselves, could not safely care for themselves in their home, and that Alvin could not manage his own finances or medications.[1] She also presented testimony suggesting that Marilyn's mental decline had started in 2015, had gotten worse by 2020, and was "way" worse in 2021. She also presented testimony of specific instances which she argued showed that Marilyn was mentally incapable of selling her property. Elsie also presented testimony suggesting that her parents did not understand the value of the property that they had sold to the Skerskis.

Following the trial, the court found that Elsie had not rebutted the presumption that the Lumsdens had the requisite mental capacity to convey their land to the Skerskis. Accordingly, the court entered judgment in favor of the Skerskis, quieting title to the property in their favor and directing Elsie to deliver to them a warranty deed. This appeal follows.

## II. MENTAL CAPACITY TO CONTRACT

### A. STANDARD OF REVIEW

Elsie, as conservator for her mother, argues that the trial court clearly erred by finding that the Lumsdens had the requisite mental capacity to enter into the five-year land contract with the Skerskis. A trial court's factual findings following a bench trial are reviewed for clear error. *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 98; 535 NW2d 529 (1995). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake was made." *Id*. at 99. "An appellate court will give deference to the trial court's superior ability to judge the credibility of the witnesses who appeared before it" during a bench trial. *Avery v State*, 345 Mich App 705, 716; 9 NW3d 115 (2023) (quotation marks and citation omitted).

### B. ANALYSIS

"A firmly embedded principle in our jurisprudence is that legal documents must be executed by one possessing the mental competence to reasonably understand the nature and effect of his [or her] action." *Persinger v Holst*, 248 Mich App 499, 503; 639 NW2d 594 (2001). When executing a deed of conveyance, an individual executing the deed must have "sufficient mental capacity to understand the business in which he engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, and to keep these facts in his mind long enough to plan and effect the conveyances in question without prompting and interference from

---

[1] The parties stipulated that the opinion of the physicians did not preclude "the possibility of either Alvin or Marilyn having a moment or moments of clarity legally sufficient to enter into and complete the transaction with the Skerskis." They further stipulated that the court would not view the physicians as expert witnesses unless they appeared to testify in court. Neither physician testified.

others." *Id*. at 503-504 (quotation marks and citation omitted). Generally, "courts presume the legality, validity, and enforceability of contracts." *Coates v Bastian Brothers, Inc*, 276 Mich App 498, 507; 741 NW2d 539 (2007). The burden of proving that a party to the contract lacked the legal capacity to enter into the contract rests upon the one challenging the contract's validity. See *Klein v Kent*, 356 Mich 122, 127-128; 95 NW2d 864 (1959). Thus, in this case, the burden was on Elsie, as her mother's conservator, to prove lack of mental capacity at the time of the sale.

"The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which the person is engaged." *In re Estate of Erickson*, 202 Mich App 329, 332; 508 NW2d 181 (1993). A contract may only be avoided based on lack of mental capacity if it appears "not only that the person was of unsound mind or insane when it was made, but that the unsoundness or insanity was of such a character that the person had no reasonable perception of the nature or terms of the contract." *Id*. "A mentally incompetent person is one who is so affected mentally as to be deprived of sane and normal action." *Id*. at 333. "A person may be incapable of conducting his business successfully and still not be mentally incompetent." *Id*.

Here, the record reflects that the Lumsdens understood the business that they were engaged in, they knew the extent and value of their property, and they knew how they wanted to dispose of it. See *Persinger*, 248 Mich App at 503-504. Indeed, the record reflects that they had long desired to sell their property to the Skerskis. And, once the Skerskis agreed to buy, Alvin went about determining a price for the property. The individuals he consulted—Elsie's husband and a realtor—suggested prices that he thought were too high, so he asked the Skerskis to name a price. He tried to offer a lower sum, but the Skerskis were firm that they would pay $750. Moreover, the record reflects that the Lumsdens were able to keep the details of the sale in mind long enough to plan and effect the conveyance. See *id*. Although Dawn prepared the purchase agreement, the Lumsdens asked them to schedule the closing. And, after the closing was scheduled, Marilyn requested that the closing date be moved up. Considering that the purchase agreement was signed on January 4, 2021 and the closing was not until January 13, 2021, this shows that they were able to keep the details of the sale in their mind until closing. And, at that time, they went over all the terms of the agreement while the closing agent was present. Taken as a whole, the record reflects that, although Marilyn had some unsoundness of mind, the unsoundness was not of such a character that she lacked any reasonable perception of the nature or terms of the land contract. See *In re Estate of Erickson*, 202 Mich App at 332.

On appeal, Elsie directs this Court to testimony and documentary evidence supporting a contrary view of the evidence. However, it was not clear error for the court to not find that evidence persuasive. With regard to the opinions by the Lumsdens' physicians, the court treated their opinions as lay, not expert opinions. And it was, as noted above, stipulated that the physicians' opinions did not preclude a finding that the Lumsdens were lucid at the time they entered into the land contract. Moreover, as it relates to Alvin, although Elsie testified that he had memory problems and was likely suffering from dementia caused by oxygen deprivation, her testimony was contradicted by other witnesses. Dawn testified that Alvin was clear minded. Theodore stated that he was "sharp as a tack." A neighbor testified that in the leadup to the sale Alvin comprehended the topics that they spoke on and could speak intelligently on them. Elizabeth, who was in the Lumsdens' home in the two-week period before the sale, testified that her father was "very much together" and that he sounded like himself.

And, although Elsie presented testimony showing that Marilyn had dementia, multiple witnesses testified that it manifested in short-term memory issues. They recalled that she would repeat herself. Further, their testimony reflected that her mental acuity decreased when she was in a stressful situation, such as when she had to deal with medical issues or with the thought of being forced to leave her home. There was no testimony that the sale was a stressful situation for her. Rather, based upon the testimony, the sale was long contemplated by the parties and she was excited that it had occurred.

Further, although there was testimony regarding several instances during which Marilyn exhibited concerning behavior, it is not apparent that each of those are the result of mental incapacity. For example, in 2015, Marilyn's desire to return home and her decision to leave a hotel angrily after her daughter washed her clothing at 3:00 a.m., could be the result of anger issues, not a lack of mental awareness. Likewise, her refusal to go to the doctor when she had a bowel obstruction, her refusal to take her medication when she was hospitalized, and her decision to rip out her IV, could have also been the result of anger issues or her distrust of doctors. The incident where she dyed her hair after discussing with Alvin that the police thought her gray hair made her look too old to drive does not clearly demonstrate that she lacked the mental capacity to sell property. And, although the incident where she drove to the emergency room, got lost, ended up with a police escort to McDonald's, and then later missed her turn home, suggests that she was having difficulty driving and navigating, it does not prove that she was mentally incompetent 100% of the time. The trial court was not required to, and did not, find that any of these incidents was sufficient to show that she lacked mental capacity at the time that she signed the land contract.

Elsie also suggests that her parents lacked mental capacity because they did not understand the value of their property. In support, she directs this Court to evidence suggesting that the property sold for less than it was worth. She suggested that the property had been appraised for $35,000.[2] Regardless, Alvin sought out information relating to the property's value. He asked both Elsie's husband what he thought the property was worth and called a realtor, who suggested that the going rate for an acre in the area was $1,000. Alvin expressed that $1,000 was too much. Given that there is evidence that the property had been clear cut and had sustained damage in the logging process, that was not an unreasonable assumption. Moreover, when the Skerskis suggested that they pay $750 an acre, Alvin countered that $700 would be better. The Skerskis declined the lower price and eventually, the parties agreed upon $750. Given the thought that Alvin put into the sale, there is no clear error in the trial court's findings as it relates to the Lumsdens' understanding of the value of their property.

Elsie also points out that Alvin appeared confused as to why he did not have more money after the sale and that he could not really tell her what he had signed. However, the testimony indicates that, at the time of the closing, the terms of the contract, including the price and the fact that the payments were to be made over a five-year period, were pointed out by the real estate agent. Given that mental capacity must exist at the time the contract is entered into, any confusion displayed by Alvin after the sale was finalized is not necessarily dispositive.

---

[2] A copy of the appraisal was not admitted as an exhibit at trial.

In sum, this case presents a classic credibility contest. The Skerskis presented testimony showing that the Lumsdens had mental capacity to sell their property and that they understood its value. Elsie presented testimony suggesting that her parents lacked mental capacity and that they did not understand the value of their property. Tasked with evaluating this contradictory evidence, the court found the Skerskis' testimony more compelling and entered a judgment in their favor. Doing so was not clear error.

## III. ADMISSION OF EVIDENCE

Elsie next argues that the trial court abused its discretion by admitting into evidence a report by Marilyn's guardian ad litem. The record, however, reflects that the report was not admitted *as evidence*. Nor did the trial court treat it as evidence when making its findings. Rather, the report merely reflects the guardian ad litem's advocacy on behalf of his client. Thus, there is no error.

Affirmed. The Skerskis may tax costs as the prevailing party.

/s/ Michael J. Kelly
/s/ Anica Letica
/s/ Randy J. Wallace